Robert LA RUE, dba the Buckit, et al.,
Plaintiffs,

v.

STATE OF CALIFORNIA, and Edward
J. Kirby, Director of Alcoholic Bev-
erage Control, Defendants.

Don MacLEAN, dba the Scorpio, et al.,*
Plaintiffs,

v.

The DEPARTMENT OF ALCOHOLIC
BEVERAGE CONTROL OF the STATE
OF CALIFORNIA, Defendant.

Jerry D. JENNINGS, dba Sugar Shack,
Erwin A. Rohm, dba Chee Chee, Ray-
mond Rohm, dba Firehouse, Richard
Carson and Robert A. Warner, dba Tus-
can Room, Seemaygro, Inc., a Califor-
nia Corporation, dba Sarong Gals, Rob-
ert E. Poff, dba 1st King, Edward
Grimes, dba the Circle, Harry J. Cole-
man dba Hi Dollie and Everett L. Butts,
dba the Worlock, Plaintiffs,

v.

Edward J. KIRBY, Director of the De-
partment of Alcoholic Beverage Control
of the State of California, John J. Can-
ney, Assistant Director of the Depart-
ment of Alcoholic Beverage Control of
the State of California, John A. Kelly,
Orange County District Administrator
of the Department of Alcoholic Bever-
age Control of the State of California,
James F. Meehan, Long Beach District
Administrator of the Department of
Alcoholic Beverage Control of the State
of California, Kermit Q. Greene, Cren-
shaw District Administrator of the De-
partment of Alcoholic Beverage Control
of the State of California, Defendants.

Civ. Nos. 70–1751–F, 70–1770–F
and 70–1782–F.

United States District Court,
C. D. California.

April 7, 1971.

* The court was provided with no additional names as plaintiffs in this action.

Harrison W. Hertzberg, Los Angeles, Cal., for Robert LaRue, dba The Buck-it and others.

Warren I. Wolfe, Donald J. Boss, Los Angeles, Cal., for Don MacLean dba The Scorpio and others.

Berrien E. Moore, Kenneth Scholtz, Gardena, Cal., for Jerry D. Jennings dba Sugar Shack and others.

Evelle J. Younger, Atty. Gen., Los Angeles, Cal., L. Stephen Porter, Deputy Atty. Gen., San Francisco, Cal., for defendants.

Before ELY, Circuit Judge, and GRAY and FERGUSON, District Judges.

## MEMORANDUM OPINION

FERGUSON, District Judge:

In 1967, the California Supreme Court, in an obscenity case, declared:

"The United States Supreme Court has wisely recognized that ultimately the public taste must determine that which is offensive to it and that which is not; a public taste that is sophisticated and mature will reject the offensive and the dull; it will in its own good sense discard the tawdry, and once having done so, the tawdry will disappear because its production and distribution will not be profitable.

Understandably, such maturity does not come quickly or easily, and, in a time when the strictures of Victorianism have been replaced by wide swings of extremism, it seems hopelessly remote." People v. Noroff, 67 Cal.2d 791, 796–797, 63 Cal.Rptr. 575, 579, 433 P.2d 479, 483 (1967).

After that statement by California's highest court, it is somewhat surprising that a federal district court four years later is called upon to determine whether a state administrative agency may require "fig leaves" to be worn by entertainers in California.

These three actions are brought pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202, and 42 U.S.C. § 1983, by various holders of California liquor licenses and dancers at licensed premises. A three-judge court was convened in accordance with 28 U.S.C. §§ 2281 and 2284. The actions seek to enjoin the enforcement of certain statewide rules adopted by the Department of Alcoholic Beverage Control and Edward J. Kirby, its director. The parties, by pre-trial stipulations and orders, have acknowledged proper jurisdiction and venue in this court.

### Rules in Issue

The Department is established pursuant to Article 20, Section 22 of the California Constitution. That section provides in part:

"The Department of Alcoholic Beverage Control shall have the exclusive power, except as herein provided and in accordance with laws enacted by the Legislature, to license the manufacture, importation and sale of alcoholic beverages in this State, and to collect license fees or occupation taxes on account thereof. The department shall have the power, in its discretion, to deny, suspend or revoke any specific alcoholic beverages license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals, or that a person seeking or holding a license has violated any law prohibiting conduct involving moral turpitude."

That paragraph of the state constitution has been interpreted to reject the contention of the Department that its power over denial, suspension and revocation of liquor licenses is limitless and absolute. It was held that the Department's power over such matters is subject to reasonable legislative enactment. Kirby v. Alcoholic Beverage Control Appeals Board, 71 Cal.2d 1200, 81 Cal.Rptr. 241, 459 P.2d 657 (1969); Samson Market Co. v. Alcoholic Beverage Control Appeals Board, 71 Cal.2d 1215, 81 Cal.Rptr. 251, 459 P.2d 667 (1969); Big Boy Liquors, Ltd. v. Alcoholic Beverage Control Appeals Board, 71 Cal.2d 1226, 81 Cal.Rptr. 258, 459 P.2d 674 (1969).

The Department adopted Rules 143.2, 143.3, 143.4 and 143.5, effective August 10, 1970. The Rules, which are set forth in Appendix A, state generally that certain entertainment on premises licensed by the Department is contrary to public welfare and morals and no liquor license may be held at any establishment where such entertainment is permitted. In summary, they provide:

(1) 143.2—prohibits topless waitresses.

(2) 143.3—
  (a) prohibits nude entertainers;
  (b) regulates the content of entertainment;
  (c) requires that certain entertainers perform on a stage.

(3) 143.4—regulates the content of movies.

(4) 143.5—prohibits any entertainment which violates a city or county ordinance.

The plaintiffs originally challenged all four Rules. However, at oral argument they withdrew their objections in these actions to the Rules which (1) prohibit topless waitresses, (2) permit local regulations, and (3) require certain entertainers to be on a stage. The plaintiffs thus concede that topless waitresses are not within the protection of the First

Amendment; that local ordinances must be independently challenged depending upon their content; and that the requirement that certain entertainers must dance on a stage is not invalid.

The court is, therefore, required to determine (1) whether Rule 143.4, which regulates the content of movies, is unconstitutional, and (2) whether those portions of Rule 143.3 which regulate the content of live entertainment are prohibited by the First, Fifth and Fourteenth Amendments.

### Doctrine of Abstention

Prior to the determination of the merits of the litigation, it must be determined whether this court should stay its hand pending state court determination. In Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (Jan. 19, 1971), the Supreme Court invalidated a state law relating to liquor matters due to constitutional infirmities. Under ordinary circumstances, this court might have adopted the reasoning of Mr. Justice Black in his dissenting opinion, when he stated: "I believe it is unfair to Wisconsin to permit its courts to be denied the opportunity of confining this law within its proper limits if it could be shown that there are other state law provisions that could provide such boundaries." 400 U.S. at 444, 91 S.Ct. at 513.

However, certain of the plaintiffs in this action have been to state court on many occasions to challenge the Rules, but the state courts have refused to assume jurisdiction over their complaints. The California Attorney General has requested the state courts to assume jurisdiction over the litigation presented here, but, rejecting that request, the state courts have refused. The Attorney General, furthermore, has asked that this court not abstain but decide the merits of the litigation.

It, therefore, appears that the doctrine of abstention should not be applied, and this court has the obligation to decide another state obscenity case before the state courts have ruled.[1] However, in order to place the litigation in proper focus, a discussion of the obscenity laws as pronounced by the California Supreme Court, as well as the United States Supreme Court, is necessary.

### Background

In 1965, a dancer in a California nightclub danced with her breasts exposed. The California Supreme Court, in In re Giannini, 69 Cal.2d 563, 72 Cal. Rptr. 655, 661, 446 P.2d 535, 541 (1968), held that she could not be convicted of either lewd conduct or indecent exposure in the absence of proof that her dance was obscene. The court stated:

"Nor can we accept the prosecution's sweeping argument that 'standards required of an obscenity prosecution are inapplicable in this case' because the 'conduct standing alone is clearly unlawful' and does not become lawful 'because it is engaged in during an activity' which would be afforded First and Fourteenth Amendment protections. Petitioner's apparent 'unlawful conduct' consisted of the baring of her breasts; the thrust of the argument presumably is that since such conduct could not be lawfully engaged in at any place and any time and under any and all circumstances it is not entitled to constitutional protec-

1. With all due respect to Judge Gray, his dissenting opinion warrants the reemphasis of two significant points. First, all parties involved agree that the California courts have refused to consider the significant constitutional questions which confront us. Second, all of the parties insist that this court *should* resolve these issues. The majority's respect for the California courts is no less than that entertained by Judge Gray, but when the California courts refuse to decide the issues, and when those issues are presented to us under orderly procedures authorized by law, we cannot abdicate our constitutional responsibility until some indefinite time which may never arrive.

tion when performed in the different context of a theatrical performance.

"The conduct here of course took place during a theatrical performance of a dance before an audience. We have previously explained that such a dance enjoys constitutional protection. The proper issue here therefore turns on whether the alleged unlawful conduct, which is inextricably a part of the dance, forfeits constitutional protection because of its alleged obscene nature.

"To isolate the questioned conduct and to judge it in an entirely different context would be to distort the nature of this case. By fictitiously changing the manner and place of its performance the prosecution would make the conduct criminal although in the actual manner and place of its performance the conduct should be tested by constitutional standards.

"Thus acts which are unlawful in a different context, circumstance, or place, may be depicted or incorporated in a stage or screen presentation and come within the protection of the First Amendment, losing that protection only if found to be obscene. Respondent's contention would automatically reject the application of the law of obscenity to the instant case. It would adjudicate Iser's conduct as if it were not performed on the stage, not a dance, and not incorporated in a form of communication. Yet the entire point of the case is that the conduct occurred in that very context."

Then, in 1968, Robert G. Barrows produced a one-act play in Hollywood, named "The Beard". The play ended with a simulated sex act, and the producer and actors were arrested for violating California Penal Code Sections involving disorderly conduct and obscenity. The California Supreme Court, in Barrows v. Municipal Court, 1 Cal.3d 821, 83 Cal.Rptr. 819, 464 P.2d 483 (1970), held that the disorderly conduct statute did not pertain to theatrical performers, and that the then existing California obscenity laws did not encompass live performances as distinguished from books, film and pictures. It was not until November of 1970 that the legislature enacted Section 311(g) of the California Penal Code, which for the first time placed live entertainment within the ambit of the obscenity statutes.

It may be asserted that parts of the Rules are invalid because they do not conform to the obscenity statutes enacted by the California Legislature in light of the trilogy interpreting the relationship between the legislature and the Department (Kirby, Samson Market Co. and Big Boy Liquors, Inc., *supra*). However, that issue is one which does not involve the Federal Constitution and, therefore, is not before this court.

In the meantime, law enforcement agencies were upset with the decisions of the United States and California Supreme Courts in the field of obscenity. In May of 1970, the Department of Alcoholic Beverage Control began hearings on the Rules which are the subject of this litigation. Law enforcement agencies, counsel and owners of licensed premises and investigators for the Department testified. The story that unfolded was a sordid one, primarily relating to sexual conduct between dancers and customers. It is obvious, after reading the transcripts, that this is why the Department adopted the Rule which requires certain entertainers to perform on a stage at least six feet away from any customer. It is also obvious why the plaintiffs have abandoned their objection to that Rule. No reasonable person could claim that entertainers and customers have a constitutional right to engage in such conduct in a cocktail lounge.

However, a fair reading of the transcripts of the hearings requires the conclusion that the Department not only desired to prohibit sexual conduct between dancers and customers, but wanted to establish a set of rules which would circumvent United States and California Supreme Court decisions relating to obscenity. Excerpts from the transcripts are contained in Appendix B. It must be stated initially, that displeasure by

law enforcement agencies and state administrative agencies with court decisions interpreting the scope of the First Amendment cannot provide the basis for those agencies to adopt rules against entertainment which is protected by those decisions.

### The Issue of Obscenity Regarding Movies

Rule 143.4 prohibits the showing of film, still pictures or other visual reproduction of certain portions of the body and conduct without regard to whether such visual portrayal is obscene.

■ One must be careful not to permit one's analysis of a theatrical performance to be clouded by his view of the same conduct in a nontheatrical context. The state may certainly regulate both, but the constitutional standards that must be applied to each are quite different. While both fall within the police power of the state, theatrical performances, as well as books, pictures and films, are within the protection of the First Amendment unless they are obscene.

In Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 77, 96 L.Ed. 1098 (1952), the Court specifically held that motion pictures are within the free speech and free press guaranties of the First and Fourteenth Amendments. More recently, the Court of Appeals for the Ninth Circuit held, in Pinkus v. Pitchess, 429 F.2d 416 (9th Cir. 1970), aff'd sub nom. California v. Pinkus, 400 U.S. 922, 91 S.Ct. 185, 27 L.Ed.2d 183 (November 23, 1970), that a "stag" movie of a woman who disrobed and feigned some type of sexual satisfaction from self-induced acts is not obscene.

The State of California may, of course, prohibit obscene movies. That is not the issue here. The issue is whether or not the state may regulate the content of movies by prohibiting those which depict certain conduct, or exposure of portions of the body, without the requirement that the movies be factually and legally determined to be obscene under the standards required by the Supreme Court.

A summary of the obscenity laws is provided in Roth v. United States, 354 U.S. 476, 488–489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957):

"The early leading standard of obscenity allowed material to be judged merely by the effect of an isolated excerpt upon particularly susceptible persons. Regina v. Hicklin, [1868] L.R. 3 Q.B. 360. Some American courts adopted this standard but later decisions have rejected it and substituted this test: whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest. The Hicklin test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press." (Footnotes omitted.)

In A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1 (1966), the Court held:

"Under this definition [of obscenity], as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

■ It is clear from these cases that isolated portions of a movie cannot be extracted out of the context of the whole. To do so has been uniformly condemned by the Supreme Court. Yet this is exactly what the Department's regulation does. Moreover, it fails to

consider any possible redeeming social value of the material taken as a whole and in no way takes contemporary community standards into consideration.

In regard to the social value requirement, the Court, in Stanley v. Georgia, 394 U.S. 557, 566, 89 S.Ct. 1243, 1248–1249, 22 L.Ed.2d 542 (1969), stated:

> "Nor is it relevant that obscene materials in general, or the particular films before the Court, are arguably devoid of any ideological content. The line between the transmission of ideas and mere entertainment is much too elusive for this Court to draw, if indeed such a line can be drawn at all."

Assuming that under the California Constitution the Department has the power to prohibit the showing of obscene movies in licensed premises, it may not use a test which was specifically rejected 14 years ago by the Supreme Court.

### The Issue of Obscenity Regarding Live Entertainment

Rule 143.3 regulates live entertainment and prohibits certain conduct and exposure. As stated previously, it is well settled that theatrical entertainment falls within the protection of the free speech-free press provisions of the First Amendment, made applicable to the states through the Fourteenth Amendment. *See, e. g.,* Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); Kingsley Pictures Corp. v. Regents, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959). In In re Giannini, 69 Cal.2d 563, 567–568, 72 Cal.Rptr. 655, 658–659, 446 P.2d 535, 538–539 (1968), the California Supreme Court stated:

> "Although the United States Supreme Court has not ruled on the precise question whether the performance of a dance is potentially a form of communication protected against state intrusion by the guarantees of the First and Fourteenth Amendments to the federal Constitution, the very definition of dance describes it as an expression of emotions or ideas.

> * * * The dance is perhaps the earliest and most spontaneous mode of expressing emotion and dramatic feeling; it exists in a great variety of forms and is among some people connected with religious belief and practice, as among the Mohammedans and Hindus."

In that case, and *Barrows, supra,* the California Supreme Court held that dancing and live theatrical performances are within the First Amendment.

> "[T]he performance of the dance indubitably represents a medium of protected expression. To take but one example, the ballet obviously typifies a form of entertainment and expression that involves communication of ideas, impressions, and feelings. Similarly, Iser's dancing, however vulgar and tawdry in content, might well involve communication to her audience." 69 Cal.2d at 570, 72 Cal.Rptr. at 660, 446 P.2d at 540.

■ It is of no significance that expression which is protected by the First Amendment takes place in a commercial setting. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). Nor does it lose its protection due to the fact that it is presented in an unusual manner. In Schacht v. United States, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970), Justice Black stated that a performance is a theatrical one even though it is not performed in a conventional way in a conventional place. There, a mime troop performed outside an induction station, and the Supreme Court held that its members were acting in a theatrical production. The Court stated that "theatrical productions need not always be performed in buildings or even on a defined area such as a conventional stage. Nor need they be performed by professional actors or be heavily financed or elaborately produced." 398 U.S. at 61, 90 S.Ct. at 1558.

Nevertheless, the Department contends that live entertainment is not

speech within the protection of the First Amendment, and relies on United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In *O'Brien*, the Court affirmed a conviction for burning a draft card in spite of the assertion by the defendant that his action was symbolic speech. However, *O'Brien* involved destruction of a selective service registration certificate. We are not dealing with violence or destruction when the subject is nothing more than the theatrical performance of dancing.

■ The Court, in *O'Brien*, set forth four individual tests which a regulation in this area must meet: (1) it must be within the constitutional power of the governmental agency; (2) it must further an important or substantial governmental interest; (3) the governmental interest must be unrelated to the suppression of free expression; and (4) the incidental restriction on First Amendment freedoms must be no greater than is essential to the furtherance of that interest.

It seems clear that the regulations in question here do not meet the requirements of *O'Brien*. In light of the pretrial stipulation, it is uncontested that none of the legitimate state interests summarized in Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967), in the field of obscenity are involved in the present case. Minors are not allowed to view the entertainment. There is no "pandering" and the entertainment is presented in such a way that it is not forced upon unwilling individuals.

Moreover, the governmental interest which the Department seems to assert is directly related to the suppression of what may very well be non-obscene free expression. The resulting restriction on First Amendment freedoms is considerably greater than is essential to the furtherance of any legitimate state interest since the Department could, as has been done by the California Legislature, limit its prohibition to obscene entertainment.

The Rule, as it pertains to dancing, runs afoul of the *Roth* decision, as does the Rule pertaining to movies. While both may be prohibited if they are obscene, neither may be prohibited unless the constitutional test of obscenity is met. One isolated act may not be taken out of context from the whole, and to be considered obscene the whole must meet the three-pronged test set forth in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

Of course, sexual conduct between a dancer and a customer could hardly be termed a theatrical performance which is protected by the First Amendment. Hopefully, the stage requirement set forth in Rule 143.3 will have the desired effect of prohibiting such conduct.

### Public Welfare and Morals

It is evident from a study of the transcripts of the public hearings that the Department enacted the Rules in an attempt to circumvent the obscenity laws, as well as to prohibit contact between dancers and customers.

■ The Department claims the Rules further a substantial governmental interest, such as protection of the public welfare and morals from B-girls, prostitution, narcotics and the protection of minors. The Department asserts that those problems are increased when alcohol and possible sexual stimulation are present within the same premises. Narcotic and prostitution violations may of course be prosecuted under criminal statutes, but certainly cannot be used as a vehicle to impose censorship without complying with the law on obscenity.

The pre-trial order stipulates that it is not disputed that the plaintiffs prohibit the attendance of minors in their establishments, and that they cause the premises and customers to be policed to insure the nonentrance of minors. The pre-trial order sets forth the further undisputed facts (1) that the dancing cannot be viewed from outside the premises,

(2) that persons are warned at the entrances of the type of entertainment that is conducted, and (3) that there is no pandering. It is, therefore, clear that none of the legitimate state interests summarized in Redrup v. New York, 386 U.S. 767, 769, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967), are involved in the present action.

■ Theatrical entertainment may not be prohibited without a constitutional obscenity test because the state deems it necessary to protect the public welfare and morals. That decision was made by the Supreme Court in Stanley v. Georgia, *supra*:

"And yet, in the face of these traditional notions of individual liberty, Georgia asserts the right to protect the individual's mind from the effects of obscenity. We are not certain that this argument amounts to anything more than the assertion that the State has the right to control the moral content of a person's thoughts. To some, this may be a noble purpose, but it is wholly inconsistent with the philosophy of the First Amendment. * * *

"Perhaps recognizing this, Georgia asserts that exposure to obscene materials may lead to deviant sexual behavior or crimes of sexual violence. There appears to be little empirical basis for that assertion. But more important, if the State is only concerned about printed or filmed materials inducing antisocial conduct, we believe that in the context of private consumption of ideas and information we should adhere to the view that '[a]mong free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law * * *.' Whitney v. California, 274 U.S. 357, 378, 47 S. Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). See Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 938 (1963)." 394 U.S. at 565–567, 89 S.Ct. at 1248–1249. (Footnotes omitted.)

In Carroll v. Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), despite the fact that the case involved the threat of violence, the Court held that while sanctions against the plaintiffs may take the form of criminal prosecutions for the violation of valid laws, they may not take the form of prior censorship, absent a showing in an adversary proceeding of a clear and present danger.

Justice Mosk of the California Supreme Court, in Burton v. Municipal Court, 68 Cal.2d 684, 696, 68 Cal.Rptr. 721, 728, 441 P.2d 281, 288 (1968), succinctly answered the issue when he stated, "It is clear that where First Amendment rights are concerned the statute itself and not the evidence in an individual case establishes the boundaries of permissible conduct. * * * "

A state is not free to adopt whatever procedures it pleases for dealing with obscenity. Marcus v. Search Warrant, 367 U.S. 717, 731, 81 S.Ct. 1708, 6 L. Ed.2d 1127 (1961). Dancing has always presented a problem to those who see it as representing perils of pagan memories. The First Amendment, however, directs that concepts of public welfare and morality may not prohibit a dance no matter how immoral it may appear to be, unless it violates an obscenity statute that meets the test of *Roth*. Clearly the Rules as they pertain to entertainment do not meet that test and were, in fact, designed to circumvent it.

### The Twenty-First Amendment Argument

Section 2 of the Twenty-First Amendment provides that:

"Sec. 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

In Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L. Ed.2d 60 (1970), Mr. Justice Douglas held that in regard to liquor regulations

the government has an unquestioned right to enact legislation to assure that the taxing power of the government over the liquor industry is effective. In Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (January 19, 1971), he stated that the police power of the states over intoxicating liquors was extremely broad even prior to the Twenty-First Amendment, citing Crane v. Campbell, 245 U.S. 304, 38 S.Ct. 98, 62 L.Ed. 304 (1917). Yet it was stated by all Justices, including those who dissented on the doctrine of abstention, that the interest of a state in regulating the liquor business cannot override the Due Process Clause of the Fourteenth Amendment. If it cannot override that clause, it certainly cannot override the First Amendment, which has always received a "preferred position" among the liberties granted to all of us. Thomas v. Collins, 323 U.S. 516, 529–530, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

All of the cases cited to the court by the Department interpreting the Twenty-First Amendment involved the interrelationship of that Amendment with the commerce clause and the import-export clause of the Constitution. It is clear that other clauses in the Constitution may not be used to restrict obscenity without complying with the standards established by the Supreme Court. *See* Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971).

■■ While it is true that one does not have an absolute right to receive a liquor license, it is equally true that the state cannot place an unconstitutional precondition on the possession of those licenses. As the Supreme Court noted in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963): "It is too late in the day to doubt that the liberties of * * * expression may be infringed by the denial of or placing conditions upon a benefit or privilege." The fact that no direct restraint or punishment is imposed upon the exercise of speech does not determine the free speech question. Indirect "discouragements" undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines or injunctions. American Communications Assn. v. Douds, 339 U.S. 382, 402, 70 S.Ct. 674, 94 L.Ed. 925 (1950). Thus, a state agency cannot exercise its constitutional power to issue, renew or revoke liquor licenses for the purpose of censoring whatever it believes to be undesirable entertainment. To allow this would allow states to circumvent the protection provided by the First Amendment and do indirectly that which they cannot do directly.

### Obscenity Must be Determined by the Courts

■ The Supreme Court, in explicit terms, has stated that the issue of obscenity must be determined by the courts and not merely by an administrative agency, no matter how well meaning it is.

In Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the Court held that any system of censorship must contain, at the mimimum, the following procedural safeguards if it is not to contravene the First and Fifth Amendments: (a) any restraint prior to judicial determination must be imposed only briefly; (b) the censor must go to court in a specified brief period; and (c) the safeguards must be contained in the statute itself or be supplied by judicial rule.

In Blount v. Rizzi, *supra*, the Court strengthened the requirement that even in noncriminal cases only the courts have the constitutional authority to determine obscenity, and that judicial review must be a swift one. There the Court cited Freedman v. Maryland, *supra*: "The teaching of our cases is that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint." 380 U.S. at 58, 85 S.Ct. at 739.

The Rules adopted by the Department of Alcoholic Beverage Control are totally void of any requirement that the Department seek any judicial review of obscenity. The very limited judicial involvement is set forth in California Business and Professions Code § 23090, which provides that:

"Any person affected by a final order of the [Alcoholic Beverage Control Appeals Board], * * * may, * * * apply to the Supreme Court or to the court of appeal for the appellate district in which the proceeding arose, for a writ of review of such final order."

In fact, as set forth previously, the Rules were designed to circumvent court decisions dealing with obscenity and to eliminate judicial determinations. That is constitutionally impermissible.

The procedure set forth by the Rules and the California Business and Professions Code requires the licensee to challenge the decision of the Department to suppress obscenity. This method was condemned in Blount v. Rizzi, *supra,* "the scheme has no statutory provision requiring governmentally initiated judicial participation in the procedure * * *, or even any procedure assuring prompt judicial review". 91 S.Ct. at 429. Judicial review of the decisions of the Department is limited to appellate review (California Business and Professions Code §§ 23090–23090.7), which does not meet the standard required by Freedman v. Maryland, *supra,* and Blount v. Rizzi, *supra.*

### Summary

[11] In summary, we hold that the Rules of the Department as written, which prohibit the content of movies and live entertainment, are void for the reason that they do not conform to the tests established by the United States Supreme Court. The other parts of the Rules, namely, those that regulate (a) the attire of waitresses; (b) the conduct between performers and customers; (c) the place where certain entertainers must perform; and (d) the adoption of local regulations provided they comport with the United States Constitution are not challenged.

Pursuant to the provisions of Rule 52 of the Federal Rules of Civil Procedure, this opinion shall constitute the findings of fact and conclusions of law of the court.

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, a judgment shall be entered in each of the three cases in favor of the plaintiffs and against the defendants as follows:

"1. Rule 143.4—*Visual Displays*— is adjudged to be in violation of the First, Fifth and Fourteenth Amendments of the Constitution of the United States, and the defendants are enjoined from enforcing the same.

"2. Rule 143.3—*Entertainers and Conduct*—is adjudged to be in violation of the First, Fifth and Fourteenth Amendments, as it pertains to live entertainment, and the defendants are enjoined from enforcing the same. This injunction does not pertain to any sexual conduct between an entertainer and a customer.

"3. Each party shall bear its own costs.

"4. The court retains jurisdiction to enforce the provisions of this judgment, for the purpose of issuing orders to clarify, modify or amend any of the provisions hereof, and for all other purposes."

### APPENDIX A

"143.2 *Attire and Conduct.* The following acts or conduct on licensed premises are deemed contrary to public welfare and morals and therefore no on-sale license shall be held at any premises where such conduct or acts are permitted:

"(1) To employ or use any person in the sale or service of alcoholic beverages in or upon the licensed premises while such person is unclothed or in such attire, costume or clothing as to expose to view any portion of the

female breast below the top of the areola or of any portion of the pubic hair, anus, cleft of the buttocks, vulva or genitals.

"(2) To employ or use the services of any hostess or other person to mingle with the patrons while such hostess or other person is unclothed or in such attire, costume or clothing as described in paragraph (1) above.

"(3) To encourage or permit any person on the licensed premises to touch, caress or fondle the breasts, buttocks, anus or genitals of any other person.

"(4) To permit any employee or person to wear or use any device or covering exposed to view, which simulates the breast, genitals, anus, pubic hair or any portion thereof.

"If any provision of this rule or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or application of the rule which can be given effect without the invalid provision or application, and to this end the provisions of this rule are severable.

"143.3. *Entertainers and Conduct.* Acts or conduct on licensed premises in violation of this rule are deemed contrary to public welfare and morals, and therefore no on-sale license shall be held at any premises where such conduct or acts are permitted.

"Live entertainment is permitted on any licensed premises, except that:

"(1) No licensee shall permit any person to perform acts of or acts which simulate:

(a) Sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law.

(b) The touching, caressing or fondling on the breast, buttocks, anus or genitals.

(c) The displaying of the pubic hair, anus, vulva or genitals.

"(2) Subject to the provisions of subdivision (1) hereof, entertainers whose breasts and/or buttocks are exposed to view shall perform only upon a stage at least 18 inches above the immediate floor level and removed at least six-feet from the nearest patron.

"No licensee shall permit any person to use artificial devices or inanimate objects to depict any of the prohibited activities described above.

"No licensee shall permit any person to remain in or upon the licensed premises who exposes to public view any portion of his or her genitals or anus.

"If any provision of this rule or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or application of the rule which can be given effect without the invalid provision or application, and to this end the provisions of this rule are severable.

"143.4. *Visual Displays.* The following acts or conduct on licensed premises are deemed contrary to public welfare and morals, and therefore no on-sale license shall be held at any premises where such conduct or acts are permitted.

"The showing of film, still pictures, electronic reproduction, or other visual reproductions depicting:

"(1) Acts or simulated acts of sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law.

"(2) Any person being touched, caressed or fondled on the breast, buttocks, anus or genitals.

"(3) Scenes wherein a person displays the vulva or the anus or the genitals.

"(4) Scenes wherein artificial devices or inanimate objects are employed to depict, or drawings are employed to portray, any of the prohibited activities described above.

"If any provision of this rule or the application thereof to any person or circumstances is held invalid such invalidity shall not affect other provisions or application of the rule which can be given effect without the invalid provision or application, and to this end the provisions of this rule are severable.

"143.5. *Ordinances*. Notwithstanding any of the provisions of Rules 143.-2, 143.3 and 143.4, no on-sale licensee shall employ, use the services of, or permit upon his licensed premises, any entertainment or person so attired as to be in violation of any city or county ordinance."

## APPENDIX B

### I

*Partial Testimony of Captain Robert Devin of the Los Angeles Police Department*

"CAPT. ROBERT A. DEVIN: Mr. Chairman, I'd like to introduce myself. I'm Capt. Robert Devin, commander of the administrative vice division of the Los Angeles Police Department. I have been a member of the police department in the City of Los Angeles for the past twenty-one and a half years. I have been assigned in my current assignment as the commander of the administrative vice division for the past one and a half years. Part of my responsibilities are the coordination, the review of the problem of pornography and obscenity throughout the City of Los Angeles. And in that capacity, I have formed some opinions. I believe I have documented the position that I am about to state to the group, and I'd like to share this information with the rules committee this morning.

"The Los Angeles Police Department supports all three of the rules changes that are proposed. We feel that there is a need for a measure of regulation in the field of live entertainment—rather, the field of nudity as pertains to live entertainment. Coincidentally, the City of Los Angeles is embarked at this time on a revised Cafe Entertainment Ordinance for the City of Los Angeles, that has been prompted primarily through recent court decisions. The Barrows Case of January 30th, 1970, has compelled us to re-examine our cafe entertainment permit ordinance, and this is in the process of revision. As a matter of fact, it's going to be acted upon by our police commission tomorrow afternoon.

"The main position that we're taking as regards the subject of nudity in locations that are licensed by the Department of Alcoholic Beverage Control, is that there is a compelling need for a separation of the entertainer from the non-entertainer. And this position is based on experience that we have had in the past one and a half years, during which time we've seen the advent and the growth of nude entertainment in our city bars.

"The former novelty of a topless female performer has now been replaced by the bottomless performer. Our first experience, our first knowledge that locations of this type were in existence in Los Angeles occurred approximately in February of 1969. In our opinion, this arose because of a California State Supreme Court decision that followed a prior federal rules, of the stated two important items. No. 1, it gave recognition to the dance as a form of expression, as a form of communication between the performer and the audience, and stated, in effect, that the dance is constitutionally protected under the first amendment. And in the absence of a showing of obscenity, that a dance was constitutionally protected. And secondarily, it imposed, as part of the showing by the people, the necessity for a new contemporary community standard, and that standard would declare to be the standard of the State of California.

"While statutory law has been available to us to regulate what was formerly considered as antisocial behavior, the federal and state judicial system has, through a series of similar decisions, effectively emasculated law enforcement in

its effort to contain and to control the growth of pornography, and of obscenity and of behavior that is associated with this kind of performance."

## II

*Partial Testimony of Roy E. June, City Attorney of the City of Costa Mesa*

"MR. ROY E. JUNE: Good morning, gentlemen. My name is Roy E. June, and I am the City Attorney for the City of Costa Mesa, and I am here by direction of the City Council of the City of Costa Mesa to support the director in your promulgation of rules and regulations relating to topless and bottomless entertainment.

\* \* \* \* \* \*

"The vigilant and reasonable attention to these establishments by the Costa Mesa Police Department has further served to place these activities in their proper perspective. The courts, however, have not been as generous. Section 647(a) of the Penal Code, lewd and dissolute conduct, is no longer available to the prosecution. We can use it under some circumstances, but not as extensively as we could in 1967.

"Portions of Section 615½ of the Penal Code, on indecent exposure, is not as available to the prosecution as it was in the year 1967. There have been inroads on these cases.

"Regulation of live entertainment, unless so broad to be cumbersome and unworkable, is no longer available to the prosecution. It remains, I think, for the Alcoholic Beverage Control Board to effectively regulate bottomless and topless dancers, and pornographic films displayed in these establishments."

## III

*Partial Testimony of Richard C. Hirsch of the office of the Los Angeles County District Attorney*

"In 1969, the Los Angeles County District Attorney's office filed approximately 781 cases involving bottomless dancing. And almost all of these cases involved performances which were conducted on premises licensed by the Department of Alcoholic Beverage Control. They are almost all bar-type establishments. As of January 1st, 1970, there were approximately 134 convictions under Penal Code statutes. Now, we have to consider what a conviction means in terms of the criminal law. Most of the cases filed were either under Penal Code, Section 647(a) as it then applied, or Section 314.1 of the Penal Code. These are the lewd and indecent exposure statutes. Most of the dances involved totally nude dancing or bottomless-type dancing. There were a few dances, some of which I personally prosecuted which involved topless-type dancing in which the dancer would wear a bikini-type bottom and then be exposed from the waist up without any sort of covering. To convict under the statutes under which these cases were filed, it had to be proven that the dance was obscene, and it had to be proven that such a dance was obscene beyond a reasonable doubt. As you no doubt know, the lewd conduct and indecent exposure statutes use words such as 'lewd,' 'lewdly,' 'dissolute,' but these words have been held to be synonymous with obscene. Therefore, to prove that there was a violation of the criminal law, we had to prove that the three elements of obscenity were established, and prove that these elements were established beyond a reasonable doubt, each to a reasonable doubt, and beyond a moral certainty. The three elements of obscenity are, number one, that the dances were substantially beyond customary limits of candor in the community, and the Supreme Court of the United States held in the Giannini case that the community which was relevant was the entire State of California. Secondly, it had to be shown that the predominant appeal to the dance was to the prurient interest, and that is a shameful or morbid interest in nudity, sex or excretion. And third, it had to be shown, and beyond a reasonable doubt, each of these stand-

ards, that the dances in question were utterly without redeeming social importance. * * *

* * * * * *

"Take an average case. Suppose we have a bottomless dance case and there is a citation issued on the dancer. And, say, the owner of the establishment who is present for aiding and abetting, that case would then be brought into the court. Generally what would happen, and this is the procedure we find in most of the defense in most of these cases, there may be a demur to the statute by the defense on the grounds that the statute on its face is unconstitutional. We have to send a deputy into court to prosecute that demurrer. Then, generally, the defense requests a pretrial hearing. And the pretrial hearing is, in effect, a separate trial. It's a full-blown trial in which ordinarily expert testimony is taken on the part of the defense and the prosecution to establish whether or not the material, the dance in question is constitutionally protected. At that time, the judge rules on whether or not it's constitutionally protected. If he rules it is not constitutionally protected, it has been the practice for the case to go up on a writ, prohibition or mandate at that time to the appellate department of the Superior Court. At that time, we have an appellate deputy who would represent our office in the appellate department on that case. Then the case will more often than not come back to the trial court. At that time, we will engage in a full trial, either court or jury trial, which may last anywhere from a few days to a week or more. And, of course, this involves a deputy being tied up in the court for this entire period of time. So, there is, on each case, the possibility of a great deal of time being expended by trial deputies in these proceedings.

"MR. SEXTON: Well, I was interested in the—or concerned about the public welfare in asking that, wondering how much it might cost the taxpayer to have to devote this amount of man-power to this type of entertainment.

"MR. HIRSCH: I don't have any specific totals for you, but I would assume that there are totals available as to what the cost of a jury trial is in a criminal case per day, and you can figure that out in the number of days that these cases would take. And I think it would be quite a considerable amount of money, plus the fact that expert witnesses must be generally paid. They are usually professional witnesses, psychiatrists in many parts, in many cases psychologists, individuals from the arts and theater who come in and expect to receive some sort of compensation for their time in court. These fees will vary in amount, but, of course, there is that expense also, in that they are first amendment cases that need that type of testimony."

WILLIAM P. GRAY, District Judge (dissenting):

It seems to me that this is a case in which our court should abstain until the courts of California have had an opportunity to consider the constitutional issues here concerned. This conclusion is reinforced by the decisions of the Supreme Court in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its five companion cases [1] that were all decided on the same day, and which came after Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), upon which the majority opinion here relies. It is true that *Younger* and its companion cases were concerned with whether a United States District Court should enjoin a currently pending state criminal prosecution, which is a somewhat different issue

---

1. Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed. 2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S. Ct. 777, 27 L.Ed. 792 (1971).

from the one here involved. However, a principal thrust of those opinions is to suggest to our three judge courts that we should give increased consideration to the concept of comity, which embodies " * * * a proper respect for state functions * * * and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. * * * What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." Younger v. Harris, 401 U. S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). This seems to me to be a good case in which to apply this principle.

The California courts are just as able as are we to consider whether or not the subject regulations square with the United States Constitution. They should be given the opportunity so to do, and I am by no means persuaded that this record shows them to have declined to assume such responsibility.

Now that this court has determined to rule on the merits of the case at hand, I find myself again in disagreement with the majority. The question here is not simply " * * * whether a state administrative agency may require 'fig leaves' to be worn by entertainers in California" (see majority opinion, page 350). I agree with Judge Ferguson that " * * * it is well settled that theatrical entertainment falls within the protection of the free speech-free press provisions of the First Amendment * * *." (Majority opinion, page 354.) However, this valid assertion of the law

does not necessarily carry the day in deciding this case.

Dancing without fig leaves may very well be a form of artistic expression protected by the First Amendment. But such a right is not absolute. For example, the state, under its police power, certainly could prohibit nude dancing on the street corner or on the campus of a junior high school. It is also within the police power to prohibit *all* sales of alcoholic beverages and to impose reasonable restrictions upon the conditions under which such sales may be made.

If we acknowledge these things, I do not think that it is beyond the constitutional right of California, through its administrative agency, to say, in its wisdom or lack of wisdom, that lewd or naked dancing (even though not necessarily obscene) and the serving of alcohol do not properly mix, and that although a person may present one or the other, he may not do both at the same place and time.

As the majority opinion indicates, it is conceded that the regulations prohibiting direct personal contact between customers and naked employees are constitutionally enforceable. The opinion also suggests that this is so because such contact and what may result therefrom are offensive to public morals. At the administrative hearing from which the subject regulations stemmed, there was testimony as to some of the horrendous things that an occasional "well-oiled" patron purportedly did to the first girl that he saw, immediately upon leaving a bar after having been aroused and "inspired" by the nude dancing. We might think up logical reasons that would warrant regulations seeking to protect the public morals against on-site offenses, and ignore any subsequent danger. But I believe that nothing in the Constitution requires such a distinction.