**Martin ERDMANN, Plaintiff-Appellant,**

v.

**Harold A. STEVENS et al., Defendants-Appellees.**

**No. 495, Docket 71-2014.**

United States Court of Appeals, Second Circuit.

Argued Feb. 25, 1972.

Decided April 12, 1972.

Paul G. Chevigny, New York City (William Leibovitz, Ellis, Stringfellow Patton & Leibovitz, New York City, on brief), for plaintiff-appellant.

Daniel M. Cohen, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, on brief), for defendants-appellees.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

In this action by Martin Erdmann, a New York attorney, against members of the Appellate Division, First Depart-

ment, State of New York, seeking declaratory and injunctive relief against disciplinary proceedings instituted by them against him on the ground that the proceedings violate his constitutional rights, he appeals from denial of preliminary injunctive relief and dismissal of his complaint. Federal jurisdiction is invoked pursuant to Title 28 U.S.C. §§ 1343 and 2201, et seq., and the federal Civil Rights Act, Title 42 U.S.C. §§ 1983 and 1985. We affirm.

On June 8, 1971 the Justices of the Appellate Division, First Department, State of New York, served upon Erdmann, a practicing member of the New York bar and trial attorney in charge of all criminal matters for the Legal Aid Society before the State Supreme Courts of the five counties of New York City, a petition and order to show cause charging him with violation of several of the precepts of the Code of Professional Responsibility, New York Judiciary Law Appendix (McKinney Supp.1971) and of the Canons of Professional Ethics, New York Judiciary Law Appendix (McKinney 1968). The charges were based upon portions of an article of approximately 10,000 words about Mr. Erdmann entitled "I Have Nothing to Do with Justice," which appeared in the March 12, 1971 issue of *Life* magazine. Erdmann's alleged unethical conduct was specified to be his assertion to the author of the article that:

> "There are so few trial judges who just judge, . . . who rule on questions of law, and leave guilt or innocence to the jury. And Appellate Division judges aren't any better. They're the whores who became madams.
>
> "I would like to [be a judge] just to see if I could be the kind of judge I think a judge should be. But the only way you can get it is to be in politics or buy it—and I don't even know the going price."

He was also cited for a breach of ethics for characterization of him by the author of the article as follows:

> "Erdmann's disrespect for judges . . . is so strong and all-inclusive that it amounts at times to class hatred. . . ."

On September 24, 1971, Erdmann instituted an action in the United States District Court for the Southern District of New York against each of the justices and the clerk of the Appellate Division, First Department. The complaint and accompanying affidavits filed in support of Erdmann's application for preliminary injunctive relief allege upon information and belief that in March 1971 the Justices of the Appellate Division, First Department, filed a grievance with the Committee on Grievances of the Association of the Bar of the City of New York grounded upon the alleged impropriety of the above comments and reported attitude, that the Committee decided that no disciplinary action should be taken and so informed Erdmann on April 30, 1971, and that despite this recommendation the Justices in June 1971 instituted the disciplinary proceedings against Erdmann now pending. Erdmann further alleges that the proceeding was brought by the Justices with the specific purpose of discouraging and preventing his exercise of his First Amendment rights, depriving him of freedom of access to the press, denying him the right to petition for redress of grievances, and in violation of his Fourteenth Amendment rights of equal protection and due process of law. He avers that he is being irreparably injured in that the charges have deterred him and other lawyers from criticizing the judiciary and have prevented him from candidly advising his subordinates as to the realities of state trial practice. His motion for preliminary injunctive relief was supported by affidavits of several lawyers and law professors emphasizing the public interest in permitting full and frank criticism of the judiciary by members of the bar.

█ In denying appellant's motion for a preliminary injunction and dismissing the complaint for lack of

jurisdiction,[1] Judge Ryan relied upon the decision of this Circuit in Zuckerman v. Appellate Division, 421 F.2d 625 (2d Cir. 1970), which held that a civil rights action could not be maintained against the Appellate Division as a body, since it is not a "person" within the meaning of 42 U.S.C. § 1983. Where (as here) the Justices and the Clerk of the Appellate Division have been sued as individuals, however, we are persuaded by the reasoning of our brother, Chief Judge Friendly, expressed in Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.Supp. 117, 123 (S. D.N.Y.1969) (three-judge court), affd. on other grounds, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971), that no sound reason exists for holding that federal courts should not have the power to issue injunctive relief against the commission of acts in violation of a plaintiff's civil rights by state judges acting in their official capacity. Accordingly, we conclude that jurisdiction exists and proceed to the merits.

The principal issue is whether, in view of the policy expressed by the Supreme Court recently in the sextet of cases headed by Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971),[2] Erdmann's complaint and supporting papers state facts entitling him to injunctive relief. In *Younger* the Supreme Court denied federal injunctive relief against a pending state criminal prosecution and held that because of the strong policy in favor of "the notion of 'comity,' that is a proper respect for state functions" and the Constitution's creation of a system in which the sensitivity of both state and federal courts must be recognized and balanced, such intervention should be permitted only under extraordinary circumstances, such as where the state proceedings have been instituted or prosecuted in bad faith or as part of a campaign of harassment which, unless restrained, would cause grave and irreparable injury without providing any reasonable prospect that the state court would respect and satisfactorily resolve the constitutional issues raised. See, e. g., Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). In thus reaffirming the long-established policy against federal intervention, see Stefanelli v. Minard, 342 U.S. 117, 72 S. Ct. 118, 96 L.Ed. 138 (1951); Cleary v. Bolger, 371 U.S. 392, 83 S.Ct. 385, 9 L. Ed.2d 390 (1963), it was recognized that unless intervention were severely restricted, alert counsel would resort to federal relief as a readily available means of disrupting or subverting legitimate state prosecutions in which constitutional issues could be resolved by competent state trial and appellate tribunals.

■■ Erdmann seeks to avoid application of the foregoing principles on several grounds. First he argues that the Appellate Division's proceeding against him is administrative rather than judicial in nature. We disagree. Although a state court may perform non-judicial functions, see Roudebush v. Hartke, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), its conduct of disciplinary proceedings with respect to those admitted to practice before it amounts to a judicial inquiry.[3] The court alone admits an

1. Defendants also moved to dismiss the complaint for failure to state a claim entitling Erdmann to relief, Rule 12(b) (6), F.R. Civ.P., which the district court did not decide in view of its dismissal of the action for lack of jurisdiction.

2. The others are: Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401

U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

3. A "judicial inquiry" has been defined by the Supreme Court as one in which the court "investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 53 L. Ed. 150 (1908); Roudebush v. Hartke, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1.

applicant to practice before it. Thereupon he becomes an officer of the court. The power to discipline, like the power to admit an applicant to membership of the bar, rests exclusively with the court. Theard v. United States, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); People ex rel. Karlin v. Culkin, 248 N.Y. 465, 162 N.E. 487 (1928). The nature of the relationship between the court and attorneys admitted to practice before it was summarized by Justice Frankfurter, speaking for a unanimous court in *Theard*:

"The two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of their officers, among whom, in the present context, lawyers are included. The court's control over a lawyer's professional life derives from his relation to the responsibilities of a court. The matter was compendiously put by Mr. Justice Cardozo, while Chief Judge of the New York Court of Appeals. ' "Membership in the bar is a privilege burdened with conditions" (Matter of Rouss, 221 N.Y. 81, 84, 116 N. E. 782, 783). The appellant was received into that ancient fellowship for something more than private gain. He became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice.' People ex rel. Karlin v. Culkin, 248 N.Y. 465, 470–471, 162 N.E. 487, 489." (354 U.S. 278, 281, 77 S. Ct. 1274, 1276, 1 L.Ed.2d 1342.)

Under § 90(2) of the New York Judiciary Law (McKinney's Consol.Laws, c. 30, 1968)[4] the Appellate Division of each judicial department in the state is given the exclusive power to resolve issues as to alleged misconduct of attorneys practicing within its jurisdiction. To implement this power it is vested with authority to hold a hearing to determine the facts of the alleged misconduct and to apply to them the relevant standards of conduct laid down in the Code of Professional Responsibility. Although the court, for practical reasons, invokes the assistance of bar associations and their committees to investigate and conduct hearings with respect to complaints regarding members of the bar, just as a federal court may employ special masters to hear and report, Rule 53, F.R. Civ.P., the disciplinary power continues to rest exclusively with the court. Indeed, in the First Department if the Grievance Committee of the Bar Association of the City of New York recommends disciplinary action, it refers the matter to the Appellate Division, which then holds a trial *de novo* before any disciplinary action may be taken. See Niles and Kaye, Spevack v. Klein: Milestone or Millstone in Bar Discipline? 53 A.B.A.J. 1121, 1124 n. 23 (Dec.1967). Accordingly, we find that the Appellate Division, First Department, is acting in its judicial capacity as a state court in the disciplinary proceedings here at issue, and that these proceedings are judicial, not administrative, in nature.

Although it is an open question whether the principles of *Younger*, which involved a state criminal prosecution, apply with equal force to a civil suit, we need not face that issue here for the reason that in our view a court's disciplinary proceeding against a member of its bar is comparable to a criminal rather than to a civil proceeding. A lawyer is not usually motivated solely by the prospect of monetary gain in seeking

---

4. New York Judiciary Law § 90, subdivision 2, provides, in part:
   "The supreme court shall have power and control over attorneys and counsellors-at-law and all persons practicing or assuming to practice law, and the appellate division of the supreme court in each department is authorized to cen- sure, suspend from practice or remove from office any attorney and counsellor-at-law admitted to practice who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice; . . . . ."

admission to the bar or in practicing his chosen profession. However, it cannot be disputed that for most attorneys the license to practice law represents their livelihood, loss of which may be a greater punishment than a monetary fine. See Bradley v. Fisher, 80 U.S. [13 Wall.] 335, 355, 20 L.Ed. 646 (1872); Spevack v. Klein, 385 U.S. 511, 516, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). Furthermore, disciplinary measures against an attorney, while posing a threat of incarceration only in cases of contempt, may threaten another serious punishment— loss of professional reputation. The stigma of such a loss can harm the lawyer in his community and in his client relations as well as adversely affect his ability to carry out his professional functions, particularly if his branch of the law is trial practice. Undoubtedly these factors played a part in leading the Supreme Court to characterize disbarment proceedings as being "of a quasi-criminal nature," In Re Ruffalo, 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L. Ed.2d 117 (1968).

■■ Thus, while "the power of the States to control the practice of law cannot be exercised so as to abrogate federally protected rights," Johnson v. Avery, 393 U.S. 483, 490 n. 11, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969), we see no sound reason for exempting a pending state court disciplinary proceeding from the principles of federal-state comity underlying *Younger* and its companion cases. The issue before us is not merely the constitutionality of a state court's action in a suit between third parties but its application of standards established by it for observance by its own officers. Although a court may neither act arbitrarily with respect to those licensed by it nor otherwise violate their constitutional rights, e. g., Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L. Ed.2d 574 (1967), state courts have traditionally been allowed wide discretion in the establishment and application of standards of professional conduct and moral character to be observed by their court officers. See, e. g., Law Students Civil Rights Research Council, Inc. v. Wadmond, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971), decided the same day as *Younger*.

The relationship between a court and those practicing before it is a delicate one. It would appear axiomatic that the effective functioning of any court depends upon its ability to command respect not only from those licensed to practice before it but also from the public at large. It requires little vision to appreciate that if a state court were subject to the supervisory intervention of a federal overseer at the threshold of the court's initiation of a disciplinary proceeding against its own officer, the state judiciary might suffer an unfair and unnecessary blow to its integrity and effectiveness.

■ The conclusory charges of Erdmann's complaint and supporting papers fail to set forth facts establishing any likelihood of success on the merits or the existence of irreparable injury, which must be shown before injunctive relief may issue. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); Clairol Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968). The Appellate Division's institution of disciplinary proceedings against him admittedly represents the exercise of a function exclusively vested in it and falls far short of the *Dombrowski*-type campaign of harassment and "official lawlessness" described by the Supreme Court in *Younger* as the kind of exceptional or extraordinary circumstances warranting federal intervention. Furthermore, there is an absence of any evidence of irreparable injury of the type warranting relief under *Younger*, which requires proof of injury substantially in excess of that normally considered sufficient to invoke equitable relief. In noting that to justify federal relief against a state prosecution

the injury must be "both great and immediate," Justice Black there stated:

"Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term. Instead, *the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution*." Younger v. Harris, 401 U.S. at 46, 91 S.Ct. at 751, 27 L.Ed.2d 669 (emphasis added).

The injury alleged here is no more than that incidental to any single prosecution of a quasi-criminal nature. There is no reason to assume that Erdmann's constitutional rights will not be protected by the Appellate Division, Third Department, to which the disciplinary proceedings against him have been transferred for adjudication, or, if further review becomes necessary, by the New York Court of Appeals. The competency of New York state courts to decide questions arising under the federal Constitution, by which we are all governed, is beyond question. In the unlikely event that both of these state appellate courts apply improper standards, Erdmann could seek Supreme Court review by petition for writ of certiorari. Undoubtedly because of general recognition of the advisability of permitting state courts first to act with respect to the delicate relationship between themselves and their officers, the traditional method of obtaining adjudication of federal constitutional questions arising out of such disciplinary proceedings has been by way of the state appellate court route to the Supreme Court rather than by direct federal intervention at the initial stages. See, e. g., Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957); Spevack v. Klein, *supra*; Matter of Willner v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963).

We must reject as frivolous Erdmann's contention that despite the transfer by the Appellate Division, First Department, of the proceedings against him to the Appellate Division, Third Department (sitting in Albany) for adjudication, he will not be able to obtain a fair hearing because the opprobrious characterization of the state court justices attributed to him in the *Life* article applied to judges of all of the state's appellate divisions. One should not be permitted to escape a court's jurisdiction merely by labelling all of its judges "whores" or "madams." Furthermore, a fair reading of the *Life* article satisfies us that the above-quoted reference was only to justices of the Appellate Divisions within New York City, which was the setting of the events related by Erdmann to the author and is the area in which Erdmann functions as trial attorney in charge of criminal cases for the Legal Aid Society. We fail to perceive any vestige of support for his contention that the Third Department will not be able to act fairly and impartially. Furthermore, as we have noted, any adverse decision by it would be subject to review by the New York Court of Appeals, no member of which is included in the remarks attributed to Erdmann in the *Life* article.

Erdmann's claim that review by the New York Court of Appeals would be inadequate because that court will neither revise punishment nor reverse the findings of an Appellate Division in a disciplinary proceeding unless the conduct condemned by it is "wholly blameless," Matter of Flannery, 212 N.Y. 610, 611, 106 N.E. 630 (1914), must also be rejected. The basis of his federal suit is not a denial that he made the statements attributed to him but that the statements *constitute criticisms of the judiciary* which are absolutely privileged under the First Amendment. See, e. g., Garrison v. Louisiana, 379 U.S. 64, 85

# 1212

S.Ct. 209, 13 L.Ed.2d 125 (1964). If the proceeding against Erdmann should not be dismissed by the Appellate Division, Third Department, for failure to prove that his alleged conduct violated a Disciplinary Rule, his serious and weighty constitutional claims must be considered by it, and, if necessary, by the New York Court of Appeals. In reviewing disciplinary proceedings on questions of law, the New York Court of Appeals is not, and constitutionally could not be, as limited as it is with respect to questions of fact. It may not uphold a finding of misconduct on the part of an attorney unless it concludes that "no substantial legal right of the accused has been violated". Matter of Goodman, 199 N.Y. 143, 144, 92 N.E. 211 (1910). Erdmann's important constitutional claims would therefore be assured of review, if necessary, by the New York Court of Appeals.

In view of Erdmann's failure to state facts entitling him to federal intervention, his complaint was properly dismissed, although for insufficiency rather than lack of jurisdiction. Rialto Theatre Co. v. City of Wilmington, 440 F.2d 1326 (3d Cir. 1971); Turco v. Allen, 334 F.Supp. 209, 219 (D.Md.1971); Sandquist v. Pitchess, 332 F.Supp. 171, 180 (C.D.Cal.1971) (three-judge court). Accordingly the district court's judgment is affirmed.

LUMBARD, Circuit Judge (concurring):

I concur in the majority opinion.

The relationship between state and federal courts has always been a delicate one; maintaining the appropriate balance between the dual sovereignties existing under our constitutional system is difficult at best. Overlapping jurisdictions between state and federal courts contribute to potential difficulties and this is particularly true when a proceeding in one court system is alleged to infringe rights susceptible of vindication in the other. To minimize the potential for conflict between the state and federal systems, federal court jurisdiction has been intentionally limited.[1]

Only last Term, the Supreme Court reaffirmed the vitality of the comity doctrine, which commands federal court restraint in the face of state proceedings in progress. In a series of cases dealing with pending state criminal prosecutions, the Court held that, barring exceptional circumstances, federal courts should not enjoin such proceedings.[2] Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971). The Court specifically noted that the mere existence of a "chilling effect [on First Amendment freedoms] should not by itself justify federal intervention." Younger v. Harris, *supra*, 401 U.S. at 50, 91 S.Ct. at 753. "Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate." Perez v. Ledesma, *supra,* 401 U.S. 85, 91 S.Ct. 677. "Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to

1. E. g., U.S.Const. art. III; U.S.Const. amend. XI; 28 U.S.C. §§ 1341–42, 2281, 2283–84; Younger v Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Ex Parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), codified at 28 U.S.C. § 2254.

2. In the context of a pending state proceeding, declaratory relief would be as disruptive as injunctive relief and neither is here warranted. See Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

defend against a single criminal prosecution could not by themselves be considered 'irreparable' in the special legal sense of that term. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." Younger v. Harris, *supra*, 401 U.S. at 46, 91 S.Ct. at 751.

While these principles were stated in cases involving state criminal proceedings, I believe that they apply with equal force to proceedings regarding the conduct of members of the state bar. The state "has a legitimate interest in determining whether [an individual] has the qualities of character and the professional competence requisite to the practice of law." Baird v. State Bar of Arizona, 401 U.S. 1, 7, 91 S.Ct. 702, 706, 27 L.Ed.2d 639 (1971). Indeed the state's responsibility in these matters is primary. A lawyer to practice anywhere in the United States must first be admitted to the bar of one of the states. In New York, as in all of the states, the proper functioning of the judicial system depends upon the competence and integrity of the members of the bar and their compliance with appropriate standards of professional responsibility. Thus, when state courts do initiate an inquiry into an attorney's conduct, they deal with a matter of such great importance to the state and its citizens that federal courts should be as slow to intervene in these proceedings as in state criminal proceedings.[3]

Erdmann urges that the presumption against federal court intervention has been overcome by his allegation of "bad faith" in the initiation of the state disciplinary proceeding. However, his complaint merely alleges that the initiation of the disciplinary proceedings has "the specific purpose and the effect of depriving plaintiff of his right[s] . . ." under the First Amendment. . . ." In his supporting affidavit, he alleges no more than that "it is unique for the Appellate Division to overrule" its Grievance Committee and that the pendency of the proceeding "harass[es], discourage[s] and prevent[s]" him from exercising his First Amendment rights. These allegations do not reach the level of "bad faith" warranting federal intervention. It is the judges and not the Grievance Committee who have the responsibility for deciding whether to begin disciplinary proceedings. N.Y.Jud. Law § 90. The allegation that the judges have acted with the intention of chilling Erdmann in the exercise of his First Amendment rights can be presented and adjudicated in the state courts, with appeal to the Supreme Court. Only were it abundantly clear that Erdmann had been subjected to multiple prosecution or continued harassment or action under a patently unconstitutional statute would federal injunctive relief be available. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Younger v. Harris, *supra*, 401 U.S. at 53–55, 91 S.Ct. 746.[4]

Erdmann, additionally, has completely failed to allege irreparable injury sufficient to any equitable relief. Nothing could be clearer from the Court's opinion in Younger v. Harris that the chilling of First Amendment rights "should not by itself justify federal intervention" 401 U.S. at 50, 91 S.Ct. at 753, and that it does not constitute irreparable injury "in the special legal sense of that term." 401 U.S. at 46, 91 S.Ct. at 751. As this is his only allegation of irrepa-

---

3. Erdmann's argument that this is an administrative, not judicial, proceeding is thus wide of the mark. While such inquiry is relevant to the question of the applicability of the federal Anti-Injunctive Statute, 28 U.S.C. 2283, which bars injunctions only in "proceedings in a State court," withholding of relief on grounds of comity demands an analysis of the state and federal interests involved and not mere labeling of a proceeding as "administrative" or "judicial."

4. For a discussion of bad faith enforcement warranting federal intervention, see Note, The Supreme Court, 1970 Term, 85 Harv. L.Rev. 3, 314 (1971).

rable injury and as his claim is susceptible of adjudication in the state court, he is not entitled to injunctive relief and the complaint should be dismissed.[5]

5. The district court dismissed the complaint erroneously relying on this court's decision in Zuckerman v. Appellate Division, 421 F.2d 625 (2d Cir. 1970). Erdmann brought this action against the judges and clerk of the First Department as individuals thus bypassing the strictures of the Eleventh Amendment, see Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L. Ed. 714 (1908) ; Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). And, as Judge Friendly demonstrated in Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F. Supp. 117 (S.D.N.Y.1969), aff'd on other grounds, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971), state judges need no immunity against federal civil rights suits seeking injunctive relief. The complaint should be dismissed, however, as Erdmann has failed to make allegations sufficient to warrant federal injunctive relief.