Btjbke, J.
(dissenting). This appeal involves an order of the Appellate Division, Third Department, which decided, with two Justices dissenting, that the appellant was guilty of professional misconduct and censured him.
The charge was based on statements and language used in an article entitled “I Have Nothing To Do With Justice ”, which appeared in the March 12, 1971 issue of Life magazine. Lawyer Erdmann said of and concerning the courts within the First Judicial Department: “ There are so few trial judges who just judge, who rule on questions of law, and leave guilt or innocence to the jury. And Appellate Division judges aren’t any better. They’re the whores who became madams. I would like to [be a judge] just to see if I could be the kind of judge I think a judge should be. But the only way you can get it is to be in politics or buy it — and I don’t even know the going price.”
The article stated: “He defends killers, burglars, rapists', robbers — the men people mean when they talk about crime in the streets. Martin Erdmann’s clients are crime in the streets. In 25 years, Martin Erdmann has defended more than 100,000 criminals. He has saved them tens of thousands of years in prison and in those years they have robbed, raped, burglarized and murdered tens upon tens of thousands of people. The idea of having had a very personal and direct hand in all that mayhem strikes him as boring and irrelevant. ‘ I have nothing to do with justice,’ he says. ‘ Justice is not even *561 part of the equation. If you say I have no moral reaction to what I do, you are right. ’ * * *
[1] ‘ He is disgusted when people accuse him of dedication. ‘ That’s just plain nonsense. The one word that does not describe me is dedicated. I reserve that word for people who do something that requires sacrifice. I don’t sacrifice anything. The only reason I’m any good is because I have an ego. I like to win. ’ * * *
“ To play the game well, a lawyer must be ruthless. He is working within, but against a system that has been battered to its knees. He must not hesitate to kick it when it’s down, and to take every advantage of its weakness. No one is better at the game than Martin Erdmann. * * *
‘ ‘ He laughs, ‘ The exultation of winning dampens any moral feelings you have. ’ * * *
‘ ‘ Erdmann talks with the defendant and gets the plea quickly accepted. Five months for homicide. As he leaves the courtroom, a DA says, ‘ Marty, you got away with murder.’
“ Erdman is gleeful. ‘ I always get away with murder.’ ”
The entire article is nothing more than a treatise upon the ability, cunning and expertise of the appellant.
It is difficult to read the article from the point of view of giving credence to the moralizing of the appellant, without coming to the conclusion that neither the legal system nor the legal profession possesses integrity and without having one’s confidence therein shaken.
As a judicial report very recently noted “To a great degree the complainant [victim] has not received the measure of protection and care he deserves ” (New York Times, May 31, 1973) due, it would appear, to the above self-described activities of the appellant.
Justices Greenblott and Simons dissented and voted to dismiss the petition being of the opinion that the majority found appellant innocent of all charges of having violated Disciplinary Rules and censured appellant as a result of their conclusion that he was guilty of a violation of ethical consideration; that ethical considerations cannot result in censure as they are aspirational in character.
The article in Life magazine containing the vulgar and insulting language as far as Erdmann is concerned is not protected *562 by the First and Fourteenth Amendments of the United States Constitution and article I of the New York State Constitution. The article, as well as the remarks, violate restrictions placed on attorneys which they impliedly assume when they accept admission to the Bar. The Supreme Court of the State of Nevada, in Matter of Raggio (87 Nev. 369) described the duty of an attorney to the courts and judicial officers very well when it stated (pp. 371-372): “ The inner motivation which caused Mr. Baggio to speak out in such intemperate fashion is unknown to us and we shall not indulge in presumptions or inferences adverse to him. We are never surprised when persons, not intimately involved with the administration of justice, speak out in anger or frustration about our work and the manner in which we perform it, and we shall protect their right to so express themselves. A member of the bar, however, stands in a different position by reason of his oath of office and the standards of conduct which he is sworn to uphold. Conformity with those standards has proven essential to the administration of justice in our courts. Mr. Baggio offended them, and, as recommended by the Board of Governors, we reprimand him therefor. ’ ’
It has long been the law that in cases of claims of First Amendment rights States still have the power to regulate conduct which offends, is inappropriate under the circumstance or could lead to disorder unless regulated (Matter of Trans-Lux Distr. Corp. v. Board of Regents, 14 N Y 2d 88, 90, 91; People v. Stover, 12 N Y 2d 462; Thornhill v. Alabama, 310 U. S. 88; Plumbers Union v. Graham, 345 U. S. 192). The proscription of. the behavior herein bears no necessary relationship to a lawyer’s freedom to speak, write or distribute information or critical opinions couched in civil language.
In other words, freedom of speech is not abridged by a reprimand for incivility to the judiciary or disparagement of the legal system. Indeed, Mr. Erdmann could have been censured for co-operating in the publication of the article which .described him as one of the best defense lawyers in the United States. In the Matter of Connelly (18 A D 2d 466 [1963]), the court noted that lawyers and law firms may not publicize themselves in the media through self-laudatory statements calculated to draw the plaudits of public through the use of self-serving statements.
*563 Returning to the First Amendment argument, it is only necessary to cite Bradley v. Fisher (13 Wall. [80 U. S.] 335) wherein the Supreme Court of the United States summed up the distinction between the ordinary citizen and the member of an honorable profession. The court stated (p. 355) that: “ [Attorneys] take upon themselves, when they are admitted to the bar, * * * not merely to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts. ‘ In matter collateral to official duty, ’ said Chief Justice Gibson in the case of Austin and others, ‘ the judge is on the level with the members of the bar as he is with his fellow-citizens, his title to distinction and respect resting on no other foundation than his virtues and qualities as a man. But it is nevertheless evident that professional fidelity may be violated by acts which fall without the lines of professional functions, and which may have been performed out of the pale of the court.’ ”
The rule laid down in Bradley was incorporated verbatim into the rules governing the conduct of attorneys in the First Department in the Matter of Murray (58 Hun 604, opn. in 11 N. Y. S. 336 [1st Dept., 1890]) and has been consistently followed, not only in other departments in this State but in other States and Federal jurisdictions. The cases of Garrison v. Louisiana (379 U. S. 64) and New York Times Co. v. Sullivan (376 U. S. 254) are irrelevant. The first case was a prosecution under a criminal defamation statute and the second case was a civil action involving defamation of public officials. In the Garrison case the court had no occasion to, and did not, consider whether Mr. Garrison’s language and manner of expression comported with his obligation to the court as an attorney. Here the appellant has not been censured for criticizing the judiciary but for the use of insulting and abusive language and the context, manner and tone evidenced not only a disrespect for the dignity and integrity of the courts, judicial officers and legal system but served as self-aggrandizement of his public image.
On this issue, the Second Circuit Court of Appeals said (Erdmann v. Stevens, 458 F. 2d 1205, 1210) in denying the *564 appellant’s application for a preliminary injunction: “ The issue before us is not merely the constitutionality of a state court’s action in a suit between third parties but its application of standards established by it for observance by its own officers.” To require civility of a lawyer is not arbitrary or a violation of his constitutional rights. Children are repeatedly reprimanded for incivility. Does this amount to an abrogation of Federally protected rights'? The Appellate Divisions have been allowed wide discretion in the establishment and application of standards of professional conduct to be observed by its officers. “ Only thus has the level of conduct for [lawyers] been kept at a level higher than that trodden by the crowd ” (Meinhard v. Salmon, 249 N. Y. 458, 464).
The court in Matter of Flannery (212 N. Y. 610) put this First Amendment argument to rest when it stated: “In establishing the standard of conduct to which the bar must at its peril conform, the Appellate Division has a wide discretion, with which we have neither the wish nor the power to interfere. If the conduct condemned is not wholly blameless, the extent to which it shall be reprobated is not for our determination. We have no right to say, where any measure of blame attaches to the offense, that the standard has been set too high.”
Accordingly, the order of the Appellate Division should be affirmed.

. The weekly domestic circulation at the time of the publication was 6,936,865 copies.