# DYSON, CHIEF OF POLICE OF DALLAS, ET AL. *v.* STEIN

No. 41.   Argued April 30, 1970—Reargued November 16, 1970—
Decided February 23, 1971

*Lonny F. Zwiener,* Assistant Attorney General of Texas, reargued the cause for appellants.   With him on the brief were *Crawford C. Martin,* Attorney General, *Nola White,* First Assistant Attorney General, *Pat Bailey,* Executive Assistant Attorney General, *Robert C. Flowers,* Assistant Attorney General, *Henry Wade, pro se, Wilson Johnston, N. Alex Bickley, Thomas B. Thorpe,* and *Preston Dial.*

*David R. Richards* reargued the cause for appellee. With him on the briefs was *Melvin L. Wulf.*

*Stanley Fleishman* filed a brief *pro se* et al. as *amici curiae* urging affirmance.

PER CURIAM.

The appellee, Stein, published a bi-weekly newspaper, the Dallas Notes. Stein was charged with two violations of Art. 527, § 1, of the Texas Penal Code, which then prohibited, among other things, the possession of obscene materials.* While these two cases were pending

---

*Texas Penal Code, Art. 527, 1961 Tex. Gen. Laws, c. 461, § 1, provided:

"Section 1. Whoever shall knowingly photograph, act in, pose for, model for, print, sell, offer for sale, give away, exhibit, televise, publish, or offer to publish, or have in his possession or under his control, or otherwise distribute, make, display, or exhibit any obscene book, magazine, story, pamphlet, paper, writing, card, advertisement, circular, print, pictures, photograph, motion picture film, image, cast, slide, figure, instrument, statue, drawing, phonograph record, mechanical recording, or presentation, or other article which is obscene, shall be fined not more than One Thousand Dollars ($1,000) nor imprisoned more than one (1) year in the county jail or both.

"Sec. 2. Whoever shall knowingly offer for sale, sell, give away, exhibit, televise, or otherwise distribute, make, display, or exhibit any obscene book, magazine, story, pamphlet, paper, writing, card, advertisement, circular, print, pictures, photograph, motion picture film, image, cast, slide, figure, instrument, statue, drawing, phonograph record, mechanical recording, or presentation, or other article which is obscene, to a minor shall be fined not more than Two Thousand, Five Hundred Dollars ($2,500) nor imprisoned in the county jail more than two (2) years or both.

"Sec. 3. For purposes of this article the word 'obscene' is defined as whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interests. Provided, further, for the purpose of this article, the term 'contemporary community standards' shall in no case involve a territory or geographic area less than the State of Texas.

"Sec. 4. Whoever shall be convicted for the second time of a violation of this article shall be deemed guilty of a felony and shall be punished by confinement in the State penitentiary for not more than five (5) years or by a fine of not more than Ten Thousand Dollars ($10,000) or by both such fine and imprisonment.

"Sec. 5. It shall be a defense to any charges brought hereunder if such prohibited matter or act shall be regularly in use in any

in state courts, Stein brought the present action in a federal district court under 42 U. S. C. §§ 1983, 1985, representing himself and a class consisting of present and future employees of and contributors to his newspaper. The defendants were the district attorney of Dallas County, and the Dallas chief of police. He sought:

> "[P]ermanent injunctive relief against the Dallas Police Department, requiring that . . . there be no arrest of plaintiff, nor seizure of his property on grounds of obscenity without a prior judicial determination of the obscene character of the material in question; . . .
>
> ". . . That the Court adjudge, decree and declare the rights of the parties with respect to the application of Article 527 of the Texas Penal Code;
>
> ". . . That the Court grant such other and further relief as is just and equitable."

A three-judge court was convened. 28 U. S. C. § 2284. That court refused to require a hearing on the

---

bona fide, religious, educational or scientific institution or the subject of a bona fide scientific investigation.

"The provisions of this Act shall not apply to any motion pictures produced or manufactured as commercial motion pictures which (1) have the seal under the Production Code of the Motion Picture Association of America, Inc.; or (2) legally move in interstate commerce under Federal Law; or (3) are legally imported from foreign countries into the United States and have been passed by a Customs Office of the United States Government at any port of entry.

"The provisions of this Act shall not apply to any daily or weekly newspaper.

"Sec. 6. The district courts of this State and the judges thereof shall have full power, authority, and jurisdiction, upon application by any district or county attorney within their respective jurisdictions, to issue any and all proper restraining orders, temporary and permanent injunctions, and any other writs and processes appropriate to carry out and enforce the provisions of this Act."

obscene character of the material before its seizure and the arrest of the plaintiff. It held that the request for such relief was "based on the alleged harassment and . . . not an attack upon the constitutionality of a statute." The court went on to emphasize that its consideration did "not in any way involve an appraisal of the constitutionality of the application of Article 527 to Plaintiff. Our sole concern is the determination of whether the statute is constitutionally defective on its face." The three-judge court then turned to the statute itself, and held that §§ 1 and 2 were unconstitutional, and that § 3 would be constitutional only if the definition of obscenity were changed somewhat. The court issued appropriate declaratory and injunctive relief effectuating its conclusions. 300 F. Supp. 602 (1969). Texas officials appealed, and we noted probable jurisdiction. 396 U. S. 954 (1969).

Today we have again stressed the rule that federal intervention affecting pending state criminal prosecutions, either by injunction or by declaratory judgment, is proper only where irreparable injury is threatened. *Douglas* v. *City of Jeannette,* 319 U. S. 157 (1943). The existence of such injury is a matter to be determined carefully under the facts of each case. In this case the District Court made no findings of any irreparable injury as defined by our decisions today; therefore, the judgment of the District Court is vacated and the case is remanded for reconsideration in light of *Younger* v. *Harris, ante,* p. 37, and *Samuels* v. *Mackell, ante,* p. 66. See also *Boyle* v. *Landry, ante,* p. 77.

*It is so ordered.*

MR. JUSTICE WHITE concurs in the result.

[For concurring opinion of MR. JUSTICE STEWART, see *ante,* p. 54.]

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MAR-
SHALL joins, concurring in the result.

My Brother DOUGLAS' dissenting opinion describes
graphically the police conduct upon which appellee rested
his allegations of bad faith and harassment. If proved,
these allegations would justify federal intervention.
The mass seizure of some two tons of the issues of
the newspaper without a prior judicial determination
of the alleged obscenity of the issues was unconstitu-
tional. *Marcus* v. *Search Warrant,* 367 U. S. 717
(1961); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58
(1963); *A Quantity of Books* v. *Kansas,* 378 U. S. 205
(1964). Similarly, the mass seizure of the tools and
equipment required to prepare the newspaper—insofar
as it disabled appellee from publishing future issues—in-
fringed the principle of *Near* v. *Minnesota,* 283 U. S. 697
(1931).

But these questions are not before us. The three-
judge court below remanded to a single judge for deter-
mination all questions advanced by appellee except the
contention that the Texas statute was unconstitutional
on its face, and the appellee does not challenge this
order of remand here. I, therefore, would reverse the
judgment of the District Court, except for paragraph 4,
for the reasons stated in my separate opinion in *Perez* v.
*Ledesma, ante,* p. 93.

MR. JUSTICE DOUGLAS, dissenting.

I

The two raids in this case were search-and-destroy
missions in the Vietnamese sense of the phrase. In
each case the police came at night. The first search
warrant authorized a search and seizure of "obscene
articles and materials, to-wit: pictures, photographs,
drawings and obscene literature" concealed at a given

address. The seizures included: two tons of a newspaper (Dallas Notes), one photograph enlarger, two portable typewriters, two electric typewriters, one camera, "numerous obscene photographs," and $5.43 in money.[1] The second warrant was issued 16 days later, in response to a claim that marihuana was concealed on the premises. It authorized the officers "to search for and seize the said narcotic drug and dangerous drug in accordance with the law in such cases provided." Not finding any marihuana on the premises, the sergeant asked instructions from his lieutenant. He was told to seize pornographic literature and any equipment used to make it. He "didn't know what to seize and what not to seize so [he] just took everything." "Everything" included a Polaroid camera, a Kodak Brownie, a Flocon camera, a Kodak lamp, a floating fixture lamp, a three-drawer desk containing printers' supplies, a drafting square, a drafting table, two drawing boards, a mailing tube, two telephones, a stapler, five cardboard boxes containing documents, one electric typewriter, and one typewriter desk. A poster of Mao Tse-tung, credit cards, costume jewelry, cans of spices, a brown sweater, and

---

[1] This indiscriminate seizure is hardly surprising since none of the officers knew what to seize, as the questioning of the lieutenant in charge of the raid shows:

"Q. What instructions did you give the officers in effecting this search and seizure as to what they were to do?

"A. They were to search for any obscene material they could find. All of our officers know what obscene material is.

"Q. What is obscene material?

"A. Well, I wish you hadn't ask [sic] that. I take that back. They don't know, neither do I.

"Q. What instructions had you given them in terms of what they were to do?

"A. To search for obscene material and seize it.

"Q. What definition, if any, did you give them as to obscene material?

"A. I didn't."

a statue of a man and woman in an embrace were also seized. Thus the newspaper Dallas Notes, a bi-monthly, was effectively put out of business.[2]

It would be difficult to find in our books a more law-less search-and-destroy raid, unless it be the one in *Kremen* v. *United States*, 353 U. S. 346. If this search-and-destroy technique can be employed against this Dallas newspaper, then it can be done to the New York Times, the Washington Post, the Seattle Post Intelli-gencer, the Yakima Herald-Republic, the Sacramento Bee, and all the rest of our newspapers. For, as I shall point out, the Texas statute governing "obscenity"[3] is plainly unconstitutional.

---

[2] Appellee Stein has since reached an agreement with the Dallas Police Department by which it returned most of the property to him in return for his execution of an Indemnity and Release Agreement. The binding effect of such an agreement, which required Stein to choose between the return of his property so that he could continue publishing, and assertion of his civil rights under such provisions as 42 U. S. C. § 1983, is not at issue here.

The Dallas Police Department still holds "film negatives, eight or ten photographs, one movie advertisement poster, one litho copy of paper, and a representative number of back issues of paper entitled 'Dallas Notes' or 'Notes from the Underground.'"

[3] Article 527 defined "obscene" as follows in § 3:

"[W]hether to the average person, applying contemporary com-munity standards, the dominant theme of the material taken as a whole appeals to prurient interests. Provided, further, for the pur-pose of this article, the term 'contemporary community standards' shall in no case involve a territory or geographic area less than the State of Texas."

After the three-judge court decision, Art. 527 was amended to define "obscene" as "material (a) the dominant theme of which, taken as a whole, appeals to a prurient interest; (b) which is pat-ently offensive because it affronts contemporary community stand-ards relating to the description or representation of sexual matters; and (c) which is utterly without redeeming social value."

And "prurient interest" was defined as "a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond

Government certainly has no power to close down newspapers. Even censorship—whether for obscenity, for irresponsible reporting or editorials, or otherwise— is taboo. As Chief Justice Hughes said in *Near* v. *Minnesota*, 283 U. S. 697, decided in 1931:

> "[T]he administration of government has become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and property by criminal alliances and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities. The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct. Subsequent punishment for such abuses as may exist is the appropriate remedy, consistent with constitutional privilege." *Id.*, at 719–720.

I agree with that view.

It is said, however, that these issues are not before us as the case has been remanded to a single judge to pass on them. But we deal with plain error, as the state statute is unconstitutional on its face and we should put an end to lawless raids under it.[4]

---

customary limits of candor in description or representation of such matters. If it appears from the character of the material or the circumstances of its dissemination that the subject matter is designed for a specially susceptible audience, the appeal of the subject matter shall be judged with reference to such audience." Tex. Penal Code, Art. 527, § 1 (Supp. 1970–1971).

[4] The appellee did not appeal from the decision of the District Court to remand the issue of harassment to a one-judge court, apparently since the ruling that the statute was unconstitutional

## II

The constitutional mandate that government [5] "shall make no law . . . abridging the freedom of speech, or of the press" precludes in my view any form of censorship. Vicious, irresponsible, and depraved as the press often is, the constitutional remedy is not censorship.[6] The antidote is education, pinning our faith to the Jeffersonian creed that by education we may in time become a mature people.[7]

---

made such further relief unnecessary, as all the harassment resulted from the enforcement of the statute. In this Court appellee has argued that his "constitutional rights [are] threatened by the existence of the Texas obscenity statute *and the overbearing means chosen to enforce it.*" He has raised the issue of harassment here and the documentary evidence in support of his claim is overwhelming.

[5] The First Amendment, originally applicable only to the Federal Government, was by virtue of the Fourteenth Amendment made applicable to the States in 1931 in *Stromberg* v. *California,* 283 U. S. 359.

[6] Thomas Jefferson wrote, "I deplore . . . the putrid state into which our newspapers have passed, and the malignity, the vulgarity, and mendacious spirit of those who write them. . . . It is however an evil for which there is no remedy, our liberty depends on the freedom of the press, and that cannot be limited without being lost." Jefferson, Democracy, selected and arranged by S. Padover 150–151 (1939).

[7] Mr. Justice Brandeis, concurring in *Whitney* v. *California,* 274 U. S. 357, 375–376, said:

"Those who won our independence . . . believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. . . . Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—

I have set forth my views over and over again as to why the First Amendment should be strictly construed; and they need not be repeated here. It is difficult—indeed impossible—to read the constitutional mandate that government "shall make no law" abridging freedom of the press to mean that government "may make some laws" abridging that freedom. Certainly a strict constructionist cannot so read it.

"The Court says it has been trying to balance the interests of society in protecting itself from the supposed evils of obscene material with the real interest in freedom of expression. There is ample evidence that the clear and definite language of the first amendment was intended to preclude the very problem of balancing assumed by the Court. The first amendment holds that the interest of society in freedom of expression [8] is more important than the harm that might flow from obscene material. The very interest in protection from injury from obscene material would be better served by allowing each individual to make a free appraisal of pornographic material. A hallmark of an immature and insecure society is the censorship of ideas. Censorship, which insulates all from what some suppose to be evil, merely magnifies that insecurity. If society does such a poor job of educating itself so that four letter words and explicit pictures are dangerous, the remedy is to improve the educational process, not

the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

[8] We deal with a large and considerable problem. There are those who believe that an "ethic of sexuality joined with an ethic of the wholeness of life" (F. Darling, Wilderness and Plenty 75 (1970)) has a close relation not only to population control but to a reverence for both the land and animal life.

to outlaw certain publications. While the first amendment does not mandate better education it does prohibit the censorship of ideas. This use of a balancing test evidences a misconception of the constitutional nature of society. There is nothing to balance. Society's security flows directly and solely from the freedom and security of each individual." 31 Albany L. Rev. 143, 151 (1967).

If I am correct in concluding that a State can make "no law" censoring the press because of obscenity, then a publisher threatened by such a law can go into a federal court to enjoin state officials from enforcing the law, as I made clear in my dissent in *Younger* v. *Harris, ante,* at 59. The special circumstances where such federal intervention is permissible are not restricted to bad faith on the part of state officials or the threat of multiple prosecutions. As Mr. Justice Butler, writing for the Court, said in *Terrace* v. *Thompson,* 263 U. S. 197, 214:

"Equity jurisdiction will be exercised to enjoin the threatened enforcement of a state law which contravenes the Federal Constitution wherever it is essential in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable; and in such a case a person, who as an officer of the State is clothed with the duty of enforcing its laws and who threatens and is about to commence proceedings, either civil or criminal, to enforce such a law against parties affected, may be enjoined from such action by a federal court of equity."

And see *Watson* v. *Buck,* 313 U. S. 387, 402.

No possible construction of this state law can save it. This is not a situation where mere overbreadth of a state statute may have chilling or crippling effects on First Amendment rights. This is a case where Texas has

entered a field which the Constitution bars all the States and the Federal Government from entering.

The Texas obscenity statute, as I view it, meets precisely the hypothetical statute we discussed in *Watson* v. *Buck,* 313 U. S. 387, 402:

> "It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it."

No clearer case justifying federal intervention to prevent a state criminal trial can be imagined.

No pending prosecutions are sought to be enjoined, only future ones.[9] Such an injunction is not impermissible under 28 U. S. C. § 2283. See *Dombrowski* v. *Pfister,* 380 U. S. 479, 484 n. 2, and my dissent in *Younger* v. *Harris, ante,* at 65. Appellee also asked for declaratory relief. If *Zwickler* v. *Koota,* 389 U. S. 241, means anything, it means that such relief can also be granted.

## III

If a publication deemed "obscene" is not under the umbrella of the First Amendment, then I do not see how it enjoys many constitutional safeguards. That which is out from under the First Amendment would normally be subject to the police power of the States. Yet the Constitution contains no standards or suggestions of standards respecting the vast array of subjects that various vocal groups would like to have suppressed—obscenity, sacrilege, un-Americanism, anti-clerical ideas, atheistic or anti-ecclesiastical ideas, Communism, racism,

---

[9] The amended complaint asked for an injunction *only* against future arrests and prosecutions under the Texas statute, Art. 527, and a declaration that the statute was unconstitutional. See n. 3, *supra.*

and so on. Under the Constitution as written there are no standards of "good" or "bad" for the press. Since there is no constitutional definition of obscenity, the definition must be largely, if not exclusively, for legislative determination. Absent a controlling constitutional standard, I would think that a legislature could treat literature as it treats sewage effluent or infectious disease. That is not a happy prospect, for some would put even the Song of Solomon under the ban. It is, I fear, where we end once we lose our First Amendment moorings. Administrative censorship, however, is one thing. Criminal punishment is quite another. Publishing "obscene" literature cannot, as I view it, be made a crime under our constitutional standards.

"Whatever 'obscenity' is, it is immeasurable as a crime and delineable only as a sin. As a sin, it is present only in the minds of some and not in the minds of others. It is entirely too subjective for legal sanction. There are as many different definitions of obscenity as there are men; and they are as unique to the individual as are his dreams." Note, The Substantive Law of Obscenity: An Adventure in Quicksand, 13 N. Y. L. F. 81, 131 (1967).

What appeals to "prurient interests" describes sin to some but not to others and seems to me to be far too vague to pass muster as a criminal, as distinguished from an administrative, statute.[10]

---

[10] This business of leveling the power of the Federal or State Government against a person in a criminal prosecution is an "awesome" power as MR. JUSTICE BLACK has stated:

"Experience, and wisdom flowing out of that experience, long ago led to the belief that agents of government should not be vested with power and discretion to define and punish as criminal past conduct which had not been clearly defined as a crime in advance." *Ginzburg* v. *United States*, 383 U. S. 463, 477 (dissenting opinion).

I see no help on the vagueness problem even if the test "utterly without redeeming social importance" were added to the criminal standard, as it was in *Jacobellis* v. *Ohio*, 378 U. S. 184, 191.[11] That is a measurement which again is wholly subjective. It cannot be related to anything but the judge's or jurors' sophistication or stage of cultural development. Nor do I think the problem is helped by introducing the concept of "contemporary community standards" whether that refers to the public at large or a local county or town standard. *Id.*, at 193.

The two tests—this Court's and that of Texas—seem to me to be substantially identical. I do not see how either can be held to be constitutional. The standard of guilt is wholly subjective. The jurors can convict or acquit according to their own personal tastes, their cultural standard, their literacy, and their tolerance for opposed ideas. And the same would be true of judges. It means that a book that is hailed as wholesome in one county may be the cause of punishment in another county of the same State.

The evidence in obscenity prosecutions is usually expert testimony. Analysts, English literature scholars, and others often have helpful and informed views, one way or the other. It seems impossible, if we continue to sanction the use of these vague standards in criminal prosecutions, that verdicts will be rendered which are based on the record and not on the emotional factors reflecting the prejudices of the judge or jurors.

Uncertainty, rather than certainty, is the standard. The book, play, poem, or movie is approved or condemned on the basis of the personal beliefs of the judge or jurors, not on the ban of a statute containing clear and objective standards.

---

[11] See n. 3, *supra*.

The concept of "utterly without redeeming social importance" will divide even the experts. It is risky and perilous business to send men to prison on such provocative issues, which confuse people and create irreconcilable differences even among the judges who sentence them or approve their convictions.

In these criminal cases dealing with obscenity, we leave people confused and in the dark as to whether they are or are not criminals. Criminal laws must give fair warning; and a person receives no real warning when he crosses the line between the lawful and the unlawful, under the Texas statute [12] or under the standard approved by the Court.

Where constitutional rights may be infringed, *Winters* v. *New York,* 333 U. S. 507, should be our guide. There an "obscene" magazine was defined to include those which "massed" stories of bloodshed and lust to incite crimes. *Id.,* at 513. We held that standard to be too vague to satisfy constitutional standards.[13]

"The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement. The crime 'must be defined with appropriate definiteness.' . . . There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment.

---

[12] Even the police have no guidance as to the kind of books to be seized. See n. 1, *supra.*

[13] Even where First Amendment or other constitutional rights are not involved, no one may be required "to speculate as to the meaning of penal statutes." *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453. Chief Justice Marshall said in *United States* v. *Wiltberger,* 5 Wheat. 76, 105, that in determining the certainty needed in a penal law for its validity the "probability" that the legislature may have desired to include a species of activity within an Act is not enough. And see *United States* v. *Lacher,* 134 U. S. 624, 628; *Pierce* v. *United States,* 314 U. S. 306.

> The vagueness may be from uncertainty in regard to persons within the scope of the act, . . . or in regard to the applicable tests to ascertain guilt." *Id.,* at 515–516.

And see *Wright* v. *Georgia,* 373 U. S. 284, 292; *Smith* v. *California,* 361 U. S. 147, 151; *United States* v. *Harriss,* 347 U. S. 612; *Beauharnais* v. *Illinois,* 343 U. S. 250, 264; *Williams* v. *United States,* 341 U. S. 97; *Cantwell* v. *Connecticut,* 310 U. S. 296.

My view, however, is that any regime of censorship over literature whether expressed in a criminal statute [14] or an administrative [15] procedure is unconstitutional by reason of the command of the First Amendment.

---

[14] See Mr. Justice Black's opinion in *Kingsley International Pictures Corp.* v. *Regents,* 360 U. S. 684, 690 (concurring).

See my opinions in *Roth* v. *United States,* 354 U. S. 476, 508 (dissenting); *Smith* v. *California,* 361 U. S. 147, 167 (concurring); *Ginzburg* v. *United States,* 383 U. S. 463, 482 (dissenting).

[15] See Mr. Justice Black's separate opinion in *A Quantity of Books* v. *Kansas,* 378 U. S. 205, 213.