**INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS SCHOOL FOR the ADVANCEMENT OF VEDIC ARTS AND SCIENCES FOR YOUTH IN AMERICA–GURUKULA (KSAVASYA–GURUKULA) et al.**

v.

**DALLAS–FORT WORTH REGIONAL AIRPORT BOARD et al.**

**Civ. A. No. 3–75–0039–F.**

United States District Court, N. D. Texas, Dallas Division.

March 21, 1975.

Gordon V. Lewis, Dallas, Tex., for plaintiffs.

S̆. G̈. Johndroe, Jr., City Atty., William W. Wood, Asst. City Atty., Fort Worth, Tex., Joseph Werner, Asst. City Atty., Dallas, Tex., John F. Boyle, Jr., City Atty., Irving, Tex., Charles C. Wells, C. Merrill Bierfeld, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

ROBERT W. PORTER, District Judge.

This is primarily a first amendment case, involving the free exercise of religion and freedom of speech. The Plaintiffs claim their constitutional rights are chilled impermissibly by the Defendants'[1] practice of having devotees of the Society of Krishna Consciousness arrested and jailed when they offer their literature and solicit donations at the Dallas-Fort Worth Regional Airport.

The individual Plaintiffs and the Plaintiff society have asked this Court to enjoin the Defendants from (a) proceeding further in the criminal charges now pending in the Municipal Court of Grapevine, Texas, (b) continuing or resuming the practice of arresting, detaining, searching and prosecuting Plaintiffs and other Krishna society members for their purportedly religious practices, (c) interfering with the Plaintiffs by preventing them from disseminating their literature and religious items and receiving donations at the airport, and (d) enforcing the ordinance under which Plaintiffs have been charged in the municipal court. In addition, Plaintiffs seek money damages and a declaratory judgment that the Defendants' acts and the ordinance are unconstitutional and that Plaintiffs' practices at the airport are constitutionally protected under the first amendment.

This Court's jurisdiction is claimed under 28 U.S.C. §§ 1331 and 1343 as well as §§ 2201 and 2202. I find that the Court has jurisdiction to proceed.

The case is before the Court on a motion for preliminary injunction. Based upon the evidence received at a hearing and the briefs and argument of counsel this Court is unable to pronounce the ordinance in question free of constitutional defects. At the same time, however, I have concluded that an injunction would be improper for the reasons detailed below.

### THE FACTS

Commendably, the attorneys have simplified the Court's task somewhat by stipulating to a number of important facts, which will be paraphrased here for brevity. The Plaintiff International Society for Krishna Consciousness is a Texas nonprofit corporation and is a religious society espousing the religious and missionary views of Krishna Consciousness. Its members have a duty under their vows to distribute religious literature, for which they seek and may accept contributions.

On December 5, 6, 12, 19 and 20, 1974, at least one of the individual Plaintiffs was arrested while distributing Krishna literature and accepting donations at the Dallas-Fort Worth Regional Airport (hereafter, D/FW). One individual Plaintiff was arrested on three different occasions; two were arrested twice each and the fourth was arrested once. The charges are identical: violating City of Grapevine, Texas, Ordinance No. 72–40, which adopts *in toto* the Code of Rules and Regulations of the Dallas-Fort Worth Regional Airport Board, which is the governing administrative body of the airport. (All airport terminal buildings are located in the Grapevine city limits.)

Because it is a violation of the Grapevine ordinance to violate the airport board's regulations, it is important in this case to note that the regulations make criminal a number of acts, including: (a) soliciting funds for any purpose at D/FW without a permit from the board,[2] (b) selling or offering to sell any article or merchandise at D/FW without a permit, concession or fran-

---

1. The Defendants, in addition to the Dallas-Fort Worth Regional Airport Board, are the board members; the cities of Dallas, Fort Worth, and Grapevine; the judge and the prosecutor of the Grapevine Municipal Court; the airport's chief of security; the Grapevine chief of police, and the executive director of the airport.

2. Code of Rules and Regulations of the Dallas/Fort Worth Regional Airport Board, chap. 3, § 4(a).

chise from the board,[3] and (c) assembling, or distributing pamphlets or other materials at D/FW without a permit from the board.[4] In the case of (c), in order to obtain a permit, the applicant must—at least three days in advance— notify the board of: (a) the full name and mailing address of the person or organization sponsoring, conducting or promoting the activity; (b) the purpose or subject thereof; (c) the date, hours and exact airport location for which the request is made, and (d) the approximate number of participants.[5]

It is also stipulated that D/FW is owned jointly by the cities of Dallas and Fort Worth. Its roadways, sidewalks, etc., have not been dedicated to public use, and a toll is charged for access to the airport, which is totally fenced to control entry.

█ More detailed information about the history and physical facilities of D/FW may be found in this Court's opinion in Continental Bus System, Inc. v. The City of Dallas and the City of Fort Worth, 386 F.Supp. 359 (N.D.Tex. 1974). That case involved a challenge to another provision of the board's rules and regulations. This Court upheld the regulations in that case, holding that the board legally could exclude common carriers from D/FW while permitting a bus line jointly owned by the two cities to operate there. This holding should not comfort the Cities or the Board in the case at bar, however, because as Mr. Justice Frankfurter noted almost thirty years ago: "It does not seem to me to further constitutional analysis to seek help for the solution of the delicate problems arising under the First Amendment from the very different order of problems which the Commerce Clause presents." Marsh v. Alabama, 326 U.S. 501, 511, 66 S.Ct. 276, 281, 90 L.Ed. 265 (1946) (concurring opinion). In short, what is private property for purposes of the commerce clause is not necessarily private property for pur-

poses of the exercise of First Amendment rights.

### THE YOUNGER DOCTRINE

The Defendants would have this Court abstain from proceeding with this case and defer to the Municipal Court of Grapevine under the doctrine of the *Younger* sextet: Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Bryne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971). The *Younger* teaching is perhaps best summed up in the concurring opinion of Mr. Justice Stewart:

The Court confines itself to deciding the policy considerations that in our federal system must prevail when federal courts are asked to interfere with pending state prosecutions. Within this area, we hold that a federal court must not, save in exceptional and extremely limited circumstances, . intervene by way of either injunction or declaration in an existing state criminal prosecution. Such circumstances exist only when there is a threat of irreparable injury "both great and immediate." A threat of this nature might be shown if the state criminal statute in question were patently and flagrantly unconstitutional on its face . . ., or if there has been bad faith and harassment—official lawlessness—in a statute's enforcement . . .. In such circumstances the reasons of policy for deferring to state adjudication are outweighed by the injury flowing from the very bringing of the state proceedings, by the perversion of the very process that is supposed to provide vindication, and by the need for speedy and

---

3. *Id.*, § 4(b).

4. *Id.*, § 13(a).

5. *Id.*

effective action to protect federal rights.

Younger v. Harris, *supra*, 401 U.S. at 56, 91 S.Ct. at 757 (Stewart and Harlan, JJ., concurring.) (Footnote omitted.)

▮ I have considered several facts in deciding not to abstain. For one thing, as noted previously, this case, unlike *Younger*, does not concern a single pending state prosecution; the Plaintiff Gregory R. Stein has been charged three times with violating the Grapevine ordinance, and the Plaintiffs Jean C. Guiffre and Roberta F. Mendelson each have been charged twice. Only the Plaintiff Robert E. Eichelberger faces a single charge.

Additionally, the Plaintiff society has no prosecution pending against it, although it definitely has an interest in the case. Accordingly, declaratory relief on the merits would be proper if grounds for same be proved. Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). In Salem Inn v. Frank, 501 F.2d 18 (2d Cir. 1974), the Plaintiffs were three taverns suing to challenge the constitutionality of a local ordinance prohibiting "topless" dancing. Although state criminal charges were brought against one of the Plaintiffs one day after the federal suit was filed —and not the other Plaintiffs—the Second Circuit held that it was proper for the federal district court to proceed on the request for preliminary injunction as to all three Plaintiffs.

Finally, while this Court is extremely reluctant to raise the specter of bad faith and harassment, neither can I rule out the possibility. To illustrate, I need only compare one facet of the fact situation in this case with the parallel situation in another airport literature distribution case, Chicago Area Military Project v. City of Chicago, 508 F.2d 921 (7th Cir., 1975), hereafter abbreviated CAMP.

In *CAMP*, several members of the Plaintiff organization began distributing free copies of their newsletter in terminal buildings at O'Hare Airport in Chicago. They left the airport after a plainclothes policeman and a uniformed officer informed them leafletting was not permitted and they would be arrested if they persisted. *CAMP, supra*, at 923.

In sharp contrast, the Plaintiff Jean Guiffre testified at the hearing on the motion for preliminary injunction about one of her two arrests at D/FW. She testified that she was seated, talking to a boy who had accepted one of her books and who had donated about sixty-two cents. Then, she testified:

. . . one of the security officers came charging down through the terminal. He was way over on the other side, and he just came running through the terminal and shouted that "I saw you, Jean, I saw you do it, and you are under arrest." And he took me in and, "Boy," he said, "you better not lie," because the boy was telling him that there was nothing wrong going on, that he wanted the book, and then he also took the boy in and threatened him with arrest if he caused any trouble. That's one that I remember. He took me away immediately to some little room.

Q  Were you handcuffed?

A  Well, I wasn't handcuffed in the terminal, but later on I was.

\*   \*   \*   \*   \*   \*

A  . . . They take my bag away, take my books away, and then they ask me all kinds of questions in there, and then they take me from that room and they put handcuffs on real tight, you know, and then they take you by your arm and hustle you into a police car outside, and then they take you to another place where you have to be in a cell.

\*   \*   \*   \*   \*   \*

A  . . . They take everything away from you. They take your neck beads off. It's really a very serious matter for a devotee, because his neck beads are one of his symbols of surrender to his spiri-

tual master, so it's not so nice to have his neck beads taken away.

Q  They are physically removed from you; you don't take them off yourself?

A  Yes, my neck beads have to be broken to be taken off.

Q  They were broken?

A  Yes, because they are tied on.

This Plaintiff, a slightly built young woman, did not strike the Court as bellicose or belligerent or likely to pose any physical threat to the D/FW security officers.  Like the other Krishna devotees in the courtroom during the hearing, she was quiet and well mannered.  Neither cross-examination nor other evidence proffered by the Defendants revealed the existence of any reason for such tactics by the arresting officers.

It is pertinent here to briefly note two prior decisions of the United States Supreme Court, each of which had a factual setting in Dallas.  The earlier case, Jamison v. Texas, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943), voided a Dallas ordinance prohibiting the distribution of handbills on city streets.  The appellant in that case was a Jehovah's Witness.  The later case was Dyson v. Stein, *supra*, where the target of a Dallas police raid was the office of an "underground" newspaper.

Those cases are cited merely to point out that the Dallas-Fort Worth area has not become known as a refuge for those who would espouse causes unpopular with the majority, or "the establishment."  It has been the Court's observation, however, that First Amendment rights, such as those of speech and religion, most often are raised by those who, like the Krishnas, are in the minority and are viewed by the majority as unpopular, if not downright unsavory.  It occurs to the Court that if the majority member who would have the itinerant preacher swept off the streets with the 6 P.M. trash, were himself arrested on the streets for cheering the Longhorn Band.[6] or caroling with Dr. Criswell,[7] then suddenly there would materialize a renaissance of majority belief in First Amendment rights, illustrative perhaps of an old Texas axiom: It depends on whose ox is in the ditch.  Be that as it may, while Krishna devotees wore ordinary street clothes when at D/FW, they usually wear attire that is, to say the least, distinctive and unconventional.  Michael R. Wright, headmaster of the Krishna school in Dallas, testified on cross-examination that Krishna men customarily wear saffron-colored robes, put a white cosmetic called tilak on their foreheads, and shave their heads closely, leaving tails of hair at the back of their heads.  Asked whether the costumes, cosmetics and shaved heads attract attention and help spread Krishna Consciousness, he replied, "Just as much as a policeman's uniform helps to attract law and order."  Their behavior as well as their appearance is unconventional, since they use chants, dancing, cymbals and other musical instruments in a ritual called Sankirtana.

In short, it is no doubt true, as the brief of the City of Fort Worth mentions, that the activities of the Plaintiffs—even in street clothes—are incompatible with "the atmosphere sought to be preserved" in the D/FW terminal buildings.  This is no more persuasive, however, than saying the activities of Mrs. Jamison, the Jehovah's Witness, were unlawful because incompatible with the atmosphere sought to be preserved on the sidewalks of downtown Dallas.

For all the foregoing reasons, I conclude that while the facts do not warrant a preliminary injunction, they likewise do not require abstention.

## THE APPLICABLE LAW

D/FW is not a downtown area with public streets and sidewalks, so Jamison v. Texas, *supra*, is not controlling.

6. The marching band of the University of Texas at Austin.

7. Dr. W. A. Criswell, pastor of the First Baptist Church in Dallas, for whom the Court has the highest regard.

D/FW is not a privately owned shopping center, so Food Employees v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), and Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), are not controlling. Two other district court cases brought by Krishna followers—International Society for Krishna Consciousness v. Conlisk, 374 F.Supp. 1010 (N.D.Ill.1973), and International Society for Krishna Consciousness, Inc. v. City of New Orleans, 347 F.Supp. 945 (E.D. La.1972), are not controlling because both cases required determining the legality of Krishna activities on the *public streets*. D/FW is not a jail, so Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), is not helpful.

The three cases that point the way to the Court's decision in the case at bar are Marsh v. Alabama, *supra*, CAMP v. Chicago, *supra*, and Kuszynski v. City of Oakland, 479 F.2d 1130 (9th Cir. 1973). *Marsh* is helpful because D/FW is analogous to a company town, and the latter two cases, because they involved anti-leafletting ordinances applicable to airports.

In *Marsh*, a Jehovah's Witness had been convicted in state court of trespass for refusing to stop distributing religious tracts on the sidewalks of Chickasaw, Alabama. The town was owned lock, stock and sidewalks by a private company, but otherwise had all the characteristics of any other American town. Similarly, the cities of Dallas and Fort Worth own D/FW airport and insist that anyone who enters it does so only by grace of their invitation to do so—particularly to board an airplane or transact other transportation-related business. The problem with the cities' position is that:

[o]wnership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.

\* \* \* \* \* \*

The managers appointed by the corporation cannot curtail the liberty of press and religion of these people [i. e. the residents and those passing through] consistently with the purposes of the Constitutional guarantees, and a state statute, as the one here involved, which enforces such action by criminally punishing those who attempt to distribute religious literature clearly violates the First and Fourteenth Amendments to the Constitution.

*Marsh*, supra, at 506, 508 of 326 U.S., at 278 of 66 S.Ct.

The teachings of *Marsh* are no less applicable to D/FW because it is a governmentally owned "company town" rather than a privately owned "company town." Tucker v. Texas, 326 U.S. 517, 66 S.Ct. 274, 90 L.Ed. 274 (1946) (a companion case to *Marsh*, reversing the conviction of a Jehovah's Witness in a Texas village owned by the United States.)

In *Kuszynski, supra,* the Ninth Circuit directed the district court, on remand, to enjoin portions of an Oakland, California, ordinance regulating the distribution of written material at the Oakland airport. The district court was directed to conduct a hearing to determine which portions of the ordinance were reasonably necessary for the management of the airport.

The Oakland ordinance, it should be noted in comparing it to the ordinance governing D/FW, forbade distribution of literature in certain areas of the airport (which are not set forth in the opinion). No materials could be distributed unless they first were submitted to the airport manager before distribution, and the distributors' identity and purpose were required to be revealed.

*CAMP, supra,* may not be on all fours with the case at bar, but it comes closer than any other case to which this Court has been cited. It was not called to the Court's attention by counsel, which is understandable since it was decided only a few weeks before the hearing and even

612

at this writing has not appeared in the advance sheets.

*CAMP* was based on freedom of speech, press and peaceable assembly, not religion. However, the Plaintiffs here also complain that the Grapevine ordinance infringes their freedom of assembly and speech. The *CAMP* literature was distributed free; the Krishna literature is not sold for a fixed price, but only rarely will it be given as a gift unless a donation is received in return. The Chicago regulation was unwritten; the D/FW regulation is written. The City of Chicago argued to the court that O'Hare Airport terminal buildings are not public places; the cities of Dallas and Fort Worth insist that D/FW is not a public place. In *CAMP*, the distributors did not attempt to hand out leaflets on airplanes or leased property; at D/FW, the terminal buildings are leased to the airlines. This, however, is a distinction without a difference.

There are two significant distinctions between *CAMP* and the present case. First, since the Chicago distributors were not selling their publication or accepting donations, there was no challenge to the portion of the Chicago ordinance that prohibited selling anything at O'Hare without a concession or lease. The portion that was involved was the one making it unlawful to "distribute literature of any nature." The Plaintiffs in this case are charged not with distributing free literature but instead with soliciting a business or trade at the airport without a permit, concession, or franchise.

Secondly, the holding in *CAMP* was limited geographically. The circuit court wrote:

. . . we recognize, as the district court did when it excluded the "fingers" leading to the arrival and departure gates from its injunction, that the Constitution does not prohibit all regulation of leafletting in publicly owned facilities. Regulations narrowly drawn to protect the state's substantial interests with the least possible constriction of the exercise of free speech and press have long been upheld. Cox v. Louisiana, 1965, 379 U.S. 559, 562, 85 S.Ct. 476, 13 L.Ed.2d 487. Thus regulations prohibiting leafletting might validly be extended from the passageways leading to the arrival and departure gates to include also leafletting at check-in counters, for example, if it should appear that such activities substantially interfere with rapid and efficient airport operations. *CAMP, supra*, at 926 of 508 F.2d.

■ The D/FW terminal buildings in which Plaintiffs were arrested are not designed like those at O'Hare and many other airports. At D/FW, there are no fingers and passageways in the usual sense. Each terminal building is comparable to the conventional departure lounge in other airports. Thus it is at least plausibly arguable that the cities may constitutionally prohibit the Krishna devotees from distributing literature and soliciting and accepting donations in the terminal buildings at D/FW. For this reason as well as the foregoing reasons, the Court will not at this time enjoin enforcement of the ordinance.

But applying the logic of *CAMP* and *Marsh* to the D/FW situation, and taking judicial knowledge of the physical facilities at D/FW, the Court suspects the cities will be hard pressed at a hearing on the merits to justify banning the Plaintiffs completely from the entire 18,000-acre area that is the Dallas-Fort Worth Regional Airport. For example, under the *Marsh* and *Jamison* cases, can the airport board and the cities that have adopted its rules constitutionally prohibit the Krishna devotees from offering their literature on the sidewalks at D/FW? This intriguing question cannot be answered at this stage of the case; it must await a hearing on the merits and, of course, by asking the question, I do not intend to imply what the correct answer is.

An order will be entered denying the Plaintiffs' motion for a preliminary in-

junction, and the case will be set for hearing on the merits. Counsel for the Defendant Dallas-Fort Worth Regional Airport Board is requested to draw such an order and submit it to the Court within five days.