Leonard L. Finz J.
The pressing issue on this motion seeking a temporary restraining order is whether the defendants, who are alleged to have threatened to "shut down JFK Airport in a massive demonstration” against the SST Concorde landings, should be enjoined.
To appreciate fully the nature of this emotion-packed dispute and the overriding constitutional issues raised the following background is submitted:
One of the threats upon man’s comfort, tranquility, and safety is the shattering noise produced by commercial jet *296 aircraft and its supersonic successor, the SST Concorde. The wrath and fury of residents, whose homes are affected by jet noises, have reached a pitch equal to the sound decibels produced by the SST. Rally upon rally has been held calling upon the angry community to protest the landing of supersonic aircraft that will, according to the community involved, fill the atmosphere with a thunderous noise level causing offending vibrations to assault the ear of the resident as well as his property value. As evidence of this community outrage thousands of angry protestors have attended public meetings to vent their anger and hostility toward the controversial aircraft. Such spirited signs as "Liberte’ Oui, Fraternite’ Oui, Concorde Non”, "We Refuse to Drop Dead”, "Stupid Sonic Transport Must Go”, and other vitriolic epithets have been commonplace at all demonstrations. The community’s wrath and indignation have reached the pitch where it is their expressed intention to shut down JFK Airport by having thousands of vehicles converge upon the airport at 1:00 p.m. on Sunday, April 17, 1977. At a rally held a few nights before the scheduled demonstration date, more than 3,000 persons in attendance were urged "to bring ten cars to the Airport to paralyze operations” and to turn it into the "world’s largest parking lot”.
This airport is among the largest and busiest in the world being an integral link to both interstate and foreign air commerce. It is an international airport that services 50 United States and foreign flag carriers which provides overseas nonstop air service to some 47 foreign cities and domestic air service (United States, Mexico and Canada) to some 67 cities. During 1976 alone, 21 million passengers passed through the doors of this giant terminal. It is this airport, JFK International, which the named defendants, together with thousands of angry residents, seek to converge upon with thousands of vehicles on what would normally be a busy Sunday. It is this action which is being sought to be enjoined by this motion seeking a temporary injunction against the named defendants who are alleged to be the leaders of the community in this massive demonstration effort. It is in this atmosphere of community protest, on one side, and the possible dangers inherent in such a massive move on the other, that compels this motion, necessitating the following decision.
Today’s emotional attitudes addressed to technology and the environment are in sharp contrast to the casual indifference *297 toward the protection of man’s environmental surroundings which was characteristic of American laxity but a generation ago. It is now a growing concern that the air we breathe, the waters we drink, and the food we eat are threatened by man-made polutants.
A community has the right to assert itself respecting those matters that affect its life, health, safety and enjoyment. In this regard, there is little doubt that there exists widespread feeling within the community that is vociferously opposed to the SST Concorde landing. The manifestation and physical projection of that feeling is protected under the First Amendment of the United States Constitution which guarantees the right to all citizens to express themselves by peaceful assembly and to speak out on those issues that concern their well-being. (Police Dept. of City of Chicago v Mosley, 408 US 92.)
That right, however, is not absolute. (Shuttlesworth v City of Birmingham, 394 US 147.) As such, were this demonstration to take place as planned and announced, there would be a devastating impact upon all of the surrounding area, not only of the immediate community involved, but of other communities as well, despite the good intentions of its activators or participants. (Hague v Committee for Ind. Organization, 307 US 496.) Under the circumstances, to pursue the action contemplated in such manner as to close down the airport and to bring it to a complete halt, would be totally and inexcusably irresponsible.
Although this court will protect the rights of all citizens toward the free exercise of speech and association as guaranteed by the First Amendment of our Constitution, one cannot, in the guise of freedom of speech and expression incite to such action as would devastate and cripple not only an international airport, but perhaps an entire city. (Cox v Louisiana, 379 US 559.)
JFK is the largest, of one of the largest, international airports in the world. It houses thousands of employees. It provides access to thousands of travelers coming from and going to every part of the world. It is a massive facility for thousands of automobiles necessary to bring people to and carry them from the airport. The devastation that could be caused by thousands of vehicles — the reports indicating an excess of 2,000 with the probability of 4,000 — choking the roads and bringing everything to a dangerous halt, could find its way into the skies above, where aircraft filled with human *298 beings could either be backed up or detoured to other airports by reason of the total confusion, and massive delay on the ground. It is in this connection that this court is mindful of the tragedy at Tenerife Airport, so fresh in our memory, where an isolated incident at an unrelated airport caused history’s worst airline disaster, taking the lives of almost 600 innocent people.
Further, were this giant air terminal to suffer the shutdown that is threatened, emergency vehicles necessary for fire, ambulance and police, all of which services are vital to the needs of our society, would be greatly if not totally removed. (United States v Dennis, 183 F2d 201.) And what about the innocent people within the immediate community who require emergency medical help? A person is stricken by a heart attack. Without immediate oxygen the victim will die. It is a life and death situation. A split moment can make the difference. The blockage of traffic, thereby preventing an ambulance coming to the side of such a person by reason of this demonstration, would be inexcusable and tragic. The passing of one’s life on Sunday would make hollow an apology on Monday.
This, the court cannot permit.
The announced demonstration boasting that JFK Airport would be shut down tight and converted into the world’s largest parking lot, would place our citizens as well as the plaintiff in jeopardy of suffering substantial, immediate and irreparable harm.
This, the court cannot permit. (Dyson v Stein, 401 US 200.)
The access roads that would be affected to a greater or lesser degree would indeed create a massive safety and traffic problem for all of the innocent residents of the community.
This, the court cannot permit.
In a contemporary motion picture entitled "Network”, part of the theme implores people to speak out on issues that affect their welfare. The court agrees that democracy can best be nourished through such freedom of expression. In the same film, the anger and frustration of the public is so intense that they shout and chant in a tone filled with frenzy, "we are mad as hell and we are not going to take it any more”.
Perhaps that expression, which this court heard used by some of the demonstrators on a recent radio broadcast, can be voiced by the innocent victims of our society, who indeed are *299 "mad as hell”, and do not want to "take it any more”. The anger and frustration to which I refer is the continuing threat upon the freedom, comfort, and safety of all of our citizens. Today, 4,000 cars converge on JFK Airport, an assault on JFK, bringing it to a complete halt. Tomorrow, the bridges by some other group. The next day, the hospitals by some other group. The next day, the nursing homes by some other group. The next day, the schools by some other group. The next day, the houses of worship by some other group. And one day, perhaps our very courts. When that occurs, our very democracy is indeed destroyed. Anarchy and mob violence become the victors. With anarchy, we lose our freedoms, our future and indeed our very purpose for living.
The great Justice Benjamin Cardozo stated it best when he said, "We live by rule of law and not by man”. History proves that our society can survive only by law or else be consumed and destroyed by man, whose attitudes, motives and actions would be so self-serving as to defeat the great ideals of true democratic values.
Now addressing the specific relief sought, this court finds that Mr. Levinson, named as one of the defendants, was one of the composers and architects of this demonstration. He states, "I cannot stop it. While it is quite true that I participated in its creation, there is no course that I can pursue to stop it, and if you, Your Honor, keep me from participating in this event, it will go in a bad direction”. Therefore, in the first instance, we have a gentleman who admits "I started it”. But now in order to make certain that it does not go "in a bad direction”, he should be permitted to be present and participate to make certain that the demonstration proceeds reasonably and properly.
To that I say: One who is the composer of music and thereafter orchestrates an arrangement for a concert, cannot remove himself from the critics’ disapproval solely because someone else conducted the orchestra at the time. Thus, in granting the temporary injunction, I enjoin Mr. Bryan Levinson, together with the other named defendants from participating directly or indirectly in the planned demonstration.
Further, I direct that Mr. Levinson make a public announcement urging and dissuading the people from attending and participating in this demonstration. The emotion, attitude and anger of the community have been served and will continue to be served, but only within constitutional and *300 lawful means. Sic utere tua ut alienum non laedas. To paraphrase, one cannot assert his rights to the injury of someone else’s.
Further, I direct that the Police Department of the City of New York and the New York Port Authority take all measures in accordance with law to maintain the peace and to implement the directives of this order. Moreover, the tone and language of this decision shall be fully executed by the police authorities to the extent that they will insure that no vehicles shall block any of the arteries or roadways; that all emergency lanes shall be kept open; that there shall be sufficient personnel available so as to carry out the mandates of this court.
This is the decision of this court, based upon the sincere and firm belief that the rights afforded by the Constitution of our Nation are to be protected to the fullest, while at the same time advancing the interests of our citizenry with equal protection for all.